**SANGRE DE CRISTO COMMUNICATIONS, INC., Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Appellees.**

**Pikes Peak Broadcasting Company and AK Media Group, Inc., Intervenors.**

**UNIVERSITY OF SOUTHERN COLORADO, Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Appellees.**

Nos. 97–1030, 97–1032.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 17, 1998.

Decided April 17, 1998.

Scott D. Dailard, Washington, DC, argued the cause for the appellants. Malcolm G.

Stevenson, Kevin F. Reed, Washington, DC, and Timothy J. O'Rourke were on the joint briefs. Lawrence M. Miller, Washington, DC, entered an appearance.

K. Michele Walters, Counsel, Federal Communications Commission, argued the cause for the appellees. Christopher J. Wright, General Counsel, Spokane, WA, Daniel M. Armstrong, Associate General Counsel, and C. Grey Pash, Jr., Counsel, Federal Communications Commission, Washington, DC, were on brief. Robert B. Nicholson, Attorney, United States Department of Justice, Washington, DC, entered an appearance.

Richard Hildreth, Andrew S. Kersting, Rosslyn, VA, James L. Winston and Walter E. Diercks, Washington, DC, were on brief for joint intervenors AK Media Group, Inc. and Pikes Peak Broadcasting Company.

Before: WILLIAMS, HENDERSON and GARLAND, Circuit Judges.

KAREN LeCRAFT HENDERSON, Circuit Judge:

Appellants University of Southern Colorado (USC) and Sangre de Cristo Communications, Inc. (Sangre de Cristo) seek to reverse a ruling of the Federal Communications Commission (FCC or Commission) denying their channel exchange proposal. *See Amendment of Section 73.606(b), Table of Allotments, TV Broadcast Stations (Pueblo, Colorado)*, 11 F.C.C.R. 19,649 (1996); *Amendment of Section 73.606(B), Table of Allotments, TV Broadcast Stations (Pueblo, Colorado)*, 10 F.C.C.R. 7662 (MMB 1995). Because the FCC's rationale for its ruling is unclear, we vacate the ruling and remand for further proceedings.

**I.**

USC is the licensee of noncommercial educational television station KTSC(TV), Channel *8,[1] Pueblo, Colorado, which provides free public television service to television viewers in southern and western Colorado. USC's transmission facilities are located north of Pueblo at Baculite Mesa. Some Colorado Springs viewers could not receive transmissions from KTSC(TV) because of intervening terrain barriers so USC used a television translator[2] on an apparently unused channel (Channel 53) in order to reach those viewers. In August 1990, however, USC was required to stop using Channel 53 when a full power station began operating on that channel.

As a result, USC sought an FCC construction permit to allow it to relocate its tower facility to Cheyenne Mountain—a location which would enable the station to reach a greater portion of the Colorado Springs–Pueblo television market. Operation at the site, however, required a waiver of the FCC's minimum distance separation requirement for television broadcast stations, *see* 47 C.F.R. § 73.610, because the Cheyenne Mountain site is "short-spaced" both to station KJCT(TV) in Grand Junction, Colorado (by 5.5 miles) and to a vacant channel allocation in Laramie, Wyoming (by 8.1 miles).[3]

In February 1991 the FCC's Mass Media Bureau (MMB or Bureau) granted a waiver to USC, explaining:

> The Commission is mindful of the unique role played by many noncommercial television stations in providing public television service to wide areas. You have established that the University serves both the Pueblo and Colorado Springs areas and that it is therefore important that your television station do so as well. You have unsuccessfully attempted to find another translator to serve Colorado Springs, and it would not be possible at this time to seek a new television channel, since there is currently a freeze on the filing of new

---

1. The FCC designates a channel reserved for noncommercial use by placing an asterisk (*) immediately preceding the channel number. *See* 47 C.F.R. § 73.606.

2. A television translator retransmits the signals of a television broadcast station to the viewing public. *See* 47 C.F.R. § 74.701(a). Translator

stations can be displaced by a regular, full-power station. *See* 47 C.F.R. § 74.702(b).

3. The Commission's mileage separation system for station transmitters operating on the same or adjacent channels is "the sole protection against inter-station interference." *WITN–TV v. FCC*, 849 F.2d 1521, 1525 (D.C.Cir.1988).

applications in that part of the country. Further, it does not appear that you could modify the facilities of your current site sufficiently to provide a viewable signal in Colorado Springs. Consequently, your only alternative is to seek a new site, and we believe you have demonstrated the unsuitability of any other sites from which you could serve both communities. We further note that, while there would be some loss areas to the south and east of Pueblo, these areas are largely unpopulated. Additionally, we agree that the mountainous terrain and your offer to reduce effective radiated power to the north and west would greatly reduce the possibility that objectionable interference to the Grand Junction station or to a future station in Laramie would occur. Finally, we note that [nearby commercial] Station KJCT(TV) in Grand Junction has not opposed your proposal. Therefore, we believe that waiver of Section 73.610 is warranted.

Letter from Barbara A. Kreisman, Chief, Video Services Division, Mass Media Bureau, Federal Communications Commission, to Thomas Aube, University of Southern Colorado 2 (Feb. 28, 1991) (Kreisman Letter).

In September 1992 USC (which had yet to begin construction on Cheyenne Mountain) and appellant Sangre de Cristo, the licensee of commercial television station KOAA–TV, Channel 5,[4] sought to exchange channels pursuant to 47 C.F.R. § 1.420(h).[5] Under their proposal, the petitioners would exchange channels and USC would transfer its Cheyenne Mountain construction permit to Sangre de Cristo. In return, Sangre de Cristo would provide financial support to USC, donate a translator station to USC and transfer the existing licensed facilities of station KOAA–TV to USC.

In July 1993 the MMB released a Notice of Proposed Rule Making regarding the proposed channel exchange. *Amendment of Section 73.606(B), Table of Allotments, TV Broadcast Stations (Pueblo, Colorado),* 8 F.C.C.R. 4752 (MMB 1993) (*Notice of Proposed Rulemaking* or *NPRM*). While noting that the proposal met several of the baseline requirements for a channel exchange under section 1.420(h),[6] the MMB insisted that the stations swap their *existing* sites only. *Id.* at 4754. The MMB's modification meant that neither station could relocate to the Cheyenne Mountain site. The MMB further noted that "although USC was granted a waiver for Station KTSC(TV) on Channel *8 based in part on the need to continue providing public television service to Colorado Springs without relying on a translator to accomplish its goal, we do not believe it appropriate to determine at the rule making stage whether a similar request from a commercial licensee would be granted at the application stage." *Id.* at 4753 n. 5. The appellants jointly objected to any alteration of their agreement, arguing that they satisfied the requirements for a channel exchange and that Sangre de Cristo's use of the Cheyenne Mountain site was crucial to their proposal. *See* Joint Comments of the University of Southern Colorado and Sangre de Cristo Communications, Inc., at 3; JA 44; Joint Reply Comments of the University of Southern Colorado and

---

4. KOAA–TV, Channel 5, is licensed to Pueblo, Colorado and is a primary affiliate of the National Broadcast Corporation. The petitioners claim that "[a]lthough licensed to Pueblo, KOAA–TV historically has served Colorado Springs in addition to its community of license." Appellants' Br. at 7.

5. Section 1.420(h) provides in part:

Where licensees (or permittees) of television broadcast stations jointly petition to ... exchange channels, and where one of the licensees (or permittees) operates on a commercial channel while the other operates on a reserved noncommercial educational channel within the same band, and the stations serve substantially

the same market, then the Commission may ... modify the licenses (or permits) of the petitioners to specify operation on the appropriate channels upon a finding that such action will promote the public interest, convenience, and necessity.

6. For example, both stations are within the same band and serve the same community of license, USC pledged to use the proceeds from the exchange solely to improve the service of its noncommercial station and the new or improved commercial and noncommercial broadcast service provides a public benefit. *See NPRM,* 8 F.C.C.R. at 4753 (applying the standards set forth in *Intraband Television Channel Exchanges,* 59 RR 2d 1455 (1986)).

Sangre de Cristo Communications, Inc., at 4–5; JA 106–07.

In 1995 the MMB rejected the appellants' proposal to exchange channels. *Amendment of Section 73.606(B), Table of Allotments, TV Broadcast Stations (Pueblo, Colorado)*, 10 F.C.C.R. 7662 (MMB 1995) (*Report & Order*). The *Report & Order* stated:

> Petitioners are correct in stating that the intraband channel exchange procedures of Section 1.420(h) of the Commission's Rules are available to permittees. However, we do not agree with petitioners' assertion that, merely because a permittee of an unbuilt station could be a party to a channel exchange, it therefore follows that a construction permit for the modification of licensed facilities "must" be transferred in connection with a channel exchange proposal.... Moreover, petitioners make far too much of the fact that the Commission recognized when it adopted Section 1.420(h) that intraband channel exchanges could result in benefits for both noncommercial and commercial stations. This recognition does not mean, as petitioners suggest, that the Commission intended in adopting its channel exchange procedures to ensure a benefit for commercial stations. Indeed, the Commission clearly stated when it adopted Section 1.420(h) that its primary purpose in doing so was to enable noncommercial educational stations to improve their service. In upholding the channel exchange policy, the U.S. Court of Appeals for the District of Columbia Circuit also explained that the Commission adopted the policy "as a rescue effort for educational broadcasting in the wake of decreases in federal funding" and repeatedly referred in its opinion to the FCC's goal of promoting educational television ... We assume that commercial stations will request channel exchanges with noncommercial stations when it is in their interest to do so, but Commission policy in no way requires that the commercial party to a channel exchange receive any particular benefit in order for the exchange to be in the public interest.

*Id.* at 7666 (internal citations omitted). Noting that "the grant of a minimum spacing waiver in connection with petitioners' request ... would be inconsistent with well established Commission policy," the MMB reasoned that, " '[a]bsent a demonstration of compelling need for departure from established interstation separation standards, the Commission will not grant a waiver of the minimum spacing rules for allotment purposes.' " *Id.* at 7667 (quoting *London, Kentucky*, 7 F.C.C.R. 5936, 5937 (MMB 1992)). The Bureau concluded that the "petitioners have not made a showing of compelling need to support their request for a short-spaced allotment" and "the public interest benefits that would be derived from the short-spaced allotment they seek are not large enough to outweigh the public interest benefit of the integrity of the TV Table of Allotments and the minimum spacing rules." *Id.*

The appellants then sought Commission review and in November 1996 the FCC upheld the MMB's denial of the proposed channel exchange. *Amendment of Section 73.606(b), Table of Allotments, TV Broadcast Stations (Pueblo, Colorado)*, 11 F.C.C.R. 19,-649 (1996) (*Memorandum Opinion & Order* or *MO&O*). The FCC noted that the appellants suffered from a "basic misunderstanding of our channel exchange policy and our short-spacing rules," explaining that "while petitioners are correct that the channel exchange rule applies to construction permits as well as licenses, neither the rule nor the cases they cite *require* approval of the instant proposal which would result in a short-spaced commercial allotment." *Id.* at 19,651 (emphasis added). The appellants argued, *inter alia*, that because the FCC had already determined that the technical difficulties in constructing a facility on Cheyenne Mountain were not so great as to deny a shortspacing waiver to USC, the FCC should therefore either transfer the pre-existing waiver to Sangre de Cristo or approve Sangre de Cristo for a waiver based upon the identical technical considerations. The FCC rejected the appellants' arguments, noting that "the waiver granted to USC was also based upon the clear and substantial benefits to noncommercial, educational service which the relocation [to Cheyenne Mountain] would permit." *Id.* at 19,652. The Commission stated that, "[b]ecause the educational station would no

longer enjoy the benefits of the short spaced Cheyenne Mountain site under the subject channel exchange proposal, the [FCC] staff was required to determine anew, for a commercial station, whether a short spacing requirement would be appropriate." *Id.* Because the appellants had made "no showing of compelling need or extraordinary circumstances ... sufficient to outweigh the public interest benefit of observing the integrity of the TV Table of Allotments and the minimum spacing rules," the FCC concluded:

> We agree with the staff's determination that the overall public interest is better served by denial of the waiver request and preservation of the integrity of the spacing requirements in this case. In weighing the public interest in this case, we also note that as many as 20,000 people or more would lose their only primary (*i.e.,* full-service, protected) commercial off-air service if the waiver were granted and KOAA–TV were to change its transmitter site.

*Id.*[7]

USC and Sangre de Cristo now ask this Court to reverse the Commission's *Memorandum Opinion & Order.*

## II.

■ We review FCC decisions "under the arbitrary and capricious review standard" and "do not 'substitute [our] judgment for that of the agency' but rather look to see 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' " *Freeman Eng'g Assocs., Inc. v. FCC,* 103 F.3d 169, 178 (D.C.Cir.1997) (quoting *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983)).

Here, however, it is unclear what the FCC believed to be the "relevant factors" in its ruling. It is undisputed that, before the 1991 waiver of the minimum spacing requirement granted to USC, the Commission did not

take the commercial or non-commercial status of short-spacing waiver applicants into account. *See, e.g.,* Appellee Br. at 21 ("This case presented the Commission with an issue of first impression."). But the waiver letter to USC signed by Barbara Kreisman, Chief of the MMB's Video Services Division, was obscure on this point: it began by noting that the FCC was "*mindful* of the unique role played by many noncommercial television stations in providing public television service to wide areas" and then catalogued eight other factors supporting waiver, none of which it identified as dispositive. *See* Kreisman Letter, *supra,* at 2 (emphasis added). In apparent contrast, the MMB's *NPRM* indicated that "USC was granted a waiver ... *based upon* its stated need to continue providing *noncommercial* educational television service to Colorado Springs without relying on a translator to provide a viewable signal to that community." 8 F.C.C.R. at 4753 (emphases added). Even though the appellants' proposed channel swap would in fact enable USC to improve its service to the Colorado Springs community in conformity with 47 C.F.R. § 1.420(h), the FCC nevertheless concluded that "the public benefits that would be derived from the short-spaced allotment [the petitioners seek] are not large enough to outweigh the public interest benefit of the integrity of the TV Table of Allotments and the minimum spacing rules." *Report & Order,* 10 F.C.C.R. at 7667; *see also MO&O,* 11 F.C.C.R. at 19,652 ("We agree with the staff's determination that the overall public interest is better served by denial of the waiver request and preservation of the integrity of the spacing requirements in this case.").

■ We conclude that the FCC did not adequately explain why the "public interest benefit of the integrity of the TV Table of Allotments and the minimum spacing rules" would be outweighed by USC's short-spaced broadcasts but not by Sangre de Cristo's. The FCC may well decide to factor the commercial status *vel non* of an applicant into its short-spacing waiver decisions, as it appears

---

7. The FCC also found "unpersuasive petitioners' argument that consideration of the noncommercial educational status of Station KTSC(TV) in

granting the waiver violates the First Amendment." *MO&O,* 11 F.C.C.R. at 19,653.

to have done, or it may develop an alternative rule.[8] Whatever the Commission decides, it must better explain the basis for its action (particularly in light of its past practice which did not consider the commercial/noncommercial status of an applicant) than it has done.[9] *See, e.g., Committee for Community Access v. FCC*, 737 F.2d 74, 77 (D.C.Cir.1984) (Commission "cannot silently depart from previous policies or ignore precedent"). And if the FCC does elect to consider the commercial/noncommercial status of an applicant, it must ground its modification in a manner consistent with the First Amendment.

### III.

While we cannot say that "the agency's reasons for declining the waiver were 'so insubstantial as to render that denial an abuse of discretion,'" *Thomas Radio Co. v. FCC*, 716 F.2d 921, 924 (D.C.Cir.1983) (citation omitted), at the same time we cannot discern with precision on what basis the FCC made its ruling. Indeed, the FCC conceded during oral argument that it had not definitively addressed the importance of the commercial/noncommercial status of a short-spacing waiver applicant. Accordingly, and for the reasons set forth above, we remand to the FCC for further proceedings consistent with this opinion.

*So ordered.*

---

8. In this regard, we note that the FCC enjoys "a broad measure of discretion in dealing with the many and complicated problems of allocation and distribution of service." *Television Corp. of Mich. v. FCC*, 294 F.2d 730, 733 (D.C.Cir.1961).

9. To the extent the Commission used a commercial/noncommercial distinction, it appears to be inconsistent with its earlier decision in *Applica-* tions of Open Media Corp., 8 F.C.C.R. 4070 (1993), which described its "policy of refusing to base waivers of rules designed to prevent interference upon non-technical considerations such as ownership or programming." *Id.* at 4071. The Commission did not even mention *Open Media* in its opinion below.