**RADIO–TELEVISION NEWS DIRECTORS ASSOCIATION and National Association of Broadcasters, Petitioners**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents**

**Office of Communication, Inc., of the United Church of Christ, et al., Intervenors**

**Nos. 98–1305, 98–1334.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 21, 1999.

Decided Aug. 3, 1999.

Daniel E. Troy argued the cause for petitioners. With him on the briefs were Richard E. Wiley, Henry L. Baumann, Jack N. Goodman and Steven A. Bookshester. Kathleen A. Kirby entered an appearance.

David M. Hunsaker and Denise B. Moline were on the briefs for appellant Freedom of Expression Foundation, Inc.

Christopher J. Wright, General Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were Frank W. Hunger, Assistant Attorney General at the time the brief was filed, U.S. Department of Justice, Mark B. Stern and Jacob M. Lewis, Attorneys, Daniel M. Armstrong, Associate General Counsel, Federal Communications Commission, and C. Grey Pash, Jr., Counsel.

Andrew Jay Schwartzman argued the cause for intervenors Office of Communication, Inc., of the United Church of Christ, et al. With him on the brief was Gigi B. Sohn.

Angela J. Campbell and Randi M. Albert were on the brief for amicus curiae Safe Energy Communication Council.

Before: EDWARDS, Chief Judge, WALD and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

These consolidated appeals challenge the Federal Communications Commission's ("FCC") decision to not repeal the personal attack and political editorial rules. Petitioners[1] maintain that the rules are "two vestiges of a bygone area of broadcasting regulation" that should have disappeared when the FCC abrogated the fairness doctrine that the two rules were allegedly intended to "effectuate." Preserving the rules when their rationale has evaporated, petitioners contend, is arbitrary and capricious, and violates the First Amendment. The FCC has deadlocked on its proposal to repeal the rules, so we review the joint statement of Commissioners Ness and Tristani supporting retention of the rules as the opinion of the agency. *See In re Radio–Television News Dirs. Ass'n*, No. 97–1528, 1998 WL 388796 (D.C.Cir.1998) (unpublished opinion).

Although the FCC issued a notice of proposed rulemaking ("NPRM") proposing to repeal or modify the two challenged rules because it had concluded that the rules might no longer be in the public interest, and that "especially searching" reexamination was necessary, the FCC now defends the rules primarily by negative implication, rejecting attacks on the rules while assuming their underlying validity. Absent affirmative justification of

the two rules as being in the public interest, or explanation of why the rules should survive in light of FCC precedent rejecting the fairness doctrine, the court is left in large part to guess the rationale that shields the rules from critiques the FCC found persuasive when reviewing the fairness doctrine, and which the FCC itself proffered in the NPRM. Such an approach to defending an existing rule against a suggestion that it be repealed might in other circumstances be sufficient to withstand judicial review under the Administrative Procedure Act, 5 U.S.C. § 706 (1994) ("APA"), but not where the NPRM and subsequent FCC precedent frame the proceeding to require a persuasive rationale for rules that seem unnecessary. Without a clear explanation for the rules, the court is not in a position to review whether they continue to serve the public interest, and whether they burden First Amendment interests too severely. The court, therefore, cannot affirm the FCC's order, but neither can it conclude that the FCC could not on remand justify the rules consistently with principles of administrative law. Accordingly, rather than enjoining enforcement of existing rules that the FCC might be able to justify, we must remand the case for the FCC to further explain its decision not to repeal or modify them. Should a further challenge be made to the FCC's decision on remand, the court will be in a position to test the FCC's rationale against the factual and legal attacks that petitioners raise against it.

**I.**

From the early days of spectrum regulation in the 1930s and 1940s, the FCC imposed upon broadcasters a duty that came to be known as the "fairness doctrine." To merit a broadcast license, applicants were obliged, first, "to cover vitally important controversial issues of

---

**1.** Petitioners are the Radio–Television News Directors Association ("RTNDA"), the National Association of Broadcasters ("NAB"), and the Freedom of Expression Foundation, Inc ("FEF").

interest in their communities," and second, "to provide a reasonable opportunity for the presentation of contrasting viewpoints." *Syracuse Peace Council*, 2 F.C.C.R. 5043, 5058 n. 2 (1987), *recon. denied*, 3 F.C.C.R.2035 (1988). The fairness doctrine persisted until 1987, although its death knell sounded in 1985, when the FCC released an exhaustive "Fairness Report" declaring the doctrine obsolete and "no longer [in] ... the public interest." *Fairness Report*, 102 F.C.C.2d 142, 246 (1985). The report concluded that new media technologies and outlets ensured dissemination of diverse viewpoints without need for federal regulation, that the fairness doctrine chilled speech on controversial subjects, and that the doctrine interfered too greatly with journalistic freedom. *See id.* at 147. The FCC did not immediately abrogate the doctrine, however, electing instead to await resolution of proposals percolating in Congress. *See id.* 247. At the time, the FCC was concerned that the 1959 amendments to the Communications Act rendered the fairness doctrine a statutory necessity, subject to repeal only by Congress. *See id.* at 227–46. Less than a year later, the court held that the fairness doctrine derived from the FCC's mandate to serve the public interest, subject to changing agency interpretation, and was not compelled by statute. *See Telecommunications Research & Action Ctr. v. FCC*, 801 F.2d 501, 517–18 (D.C.Cir.1986). The doctrine's demise swiftly followed.

In 1987, the FCC announced during an adjudication that it would no longer enforce the fairness doctrine. *Syracuse Peace Council*, 2 F.C.C.R. at 5043. Relying heavily on its 1985 Fairness Report, the FCC reasoned that the doctrine imposed substantial burdens on broadcasters without countervailing benefits. As a result, the FCC concluded that the doctrine was inconsistent with both the public interest and the First Amendment principles it was intended to promote. *See id.* at 5052. The court affirmed the conclusion that the

fairness doctrine no longer served the public interest, but did not reach the constitutional question. *See Syracuse Peace Council v. FCC*, 867 F.2d 654, 656 (D.C.Cir.1989).

The *Syracuse* order covered the fairness doctrine only as applied generally, and did not review each of its evolving permutations. In particular, the FCC noted that the order created precedent for, but did not directly resolve, reconsideration of the political editorial and personal attack rules, much less what effect general abrogation of the fairness doctrine would have on the doctrine's "every conceivable application." *Syracuse Peace Council*, 2 F.C.C.R. at 5063 n. 75.

The FCC promulgated the political editorial and personal attack rules in 1967, although it had previously enforced them as corollaries to the fairness doctrine. *See Amendment of Part 73 of the Rules to Provide Procedures in the Event of a Personal Attack or Where a Station Editorializes as to Political Candidates*, 8 F.C.C.2d 721 (1967) ("Personal Attacks & Political Editorials"). The two rules are distinct, although petitioners attack them for essentially the same reasons.

The personal attack rule provides that:

When, during the presentation of views on a controversial issue of public importance, an attack is made upon the honesty, character, integrity, or like personal qualities of an identified person or group, the licensee shall ... transmit to the persons or group attacked ... [the substance of the attack] and an offer of a reasonable opportunity to respond over the licensee's facilities.

47 C.F.R. § 73.1920(a) (1998). Several exceptions limit the rule, including exclusion of attacks in "bona fide newscasts." 47 C.F.R. § 73.1920(b)(4). The political editorial rule has a similar structure, affording political candidates notice of and an opportunity to respond to editorials oppos-

ing them or endorsing another candidate.[2] *See* 47 C.F.R. § 73.1930 (1998).

The Supreme Court has rejected facial First Amendment challenges to both rules. *See Red Lion Broad. Co. v. FCC,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).[3] The Court started from the premise that "[t]here is no sanctuary in the First Amendment for unlimited private censorship operating in a medium not open to all." *Id.* at 392, 89 S.Ct. 1794. Given the scarcity of broadcast spectrum relative to interested users, the Court concluded that victims of personal attacks and candidates opposed by editorials might be "unable without governmental assistance to gain access to ... [broadcast media] for expression of their views." *Id.* at 400, 89 S.Ct. 1794. Because dissemination of these views would serve the public's right "to receive suitable access to social, political, esthetic, moral, and other ideas and experiences," *id.* at 390, 89 S.Ct. 1794, the First Amendment benefits of the personal attack and political editorial rules justified the imposition on licensees' asserted right "continuously to broadcast whatever they choose." *Id.* at 386, 89 S.Ct. 1794. The Court cautioned, however, that "if experience with the administration of [these] doctrines indicates that they have the net effect of reducing rather than enhancing the volume and quality of coverage [of public issues], there will be time enough to reconsider the constitutional implications." *Id.* at 393, 89 S.Ct. 1794.

The instant case arises from a petition for rulemaking filed by the NAB to repeal the political editorial and personal attack rules. The petition asserted that the rules entailed unnecessarily severe administrative burdens and were counter-productive because they chilled controversial speech rather than encouraging balanced debate. In light of the FCC's experience administering the rules and *Red Lion's* cautionary limitation to then-prevailing facts, the petition invited the FCC to conclude that the rules were obsolete and had undermined, rather than furthered, First Amendment goals. In 1983, the FCC issued an NPRM proposing to repeal or modify the political editorial and personal attack rules. *See Repeal or Modification of the Personal Attack and Political Editorial Rules,* 48 Fed.Reg. 28,295 (1983). The NPRM outlined the development of First Amendment law after *Red Lion,* noting a need to test the challenged rules under the "more exacting framework of current law." *Id.* at 28,297. The FCC went so far as to state that "[w]e believe the petitioner [NAB] and other commenters have presented a compelling case that the personal attack and political editorial rules do not serve the public interest." *Id.* at 28,301. Consequently, the FCC concluded, "our reexamination of the public interest justification for the ... rules must be especially searching." *Id.* at 28,298.

And then nothing happened for a long time. The Fairness Report appeared in 1985, but did not discuss the political editorial and personal attack rules. The fairness doctrine disappeared in 1987, again without resolution of the pending NPRM. In 1987, NAB and other interested parties filed a "petition for expedited rulemaking"

---

**2.** Specifically, the political editorial rule provides, in part, that:

> [w]here a licensee, in an editorial ... [e]ndorses or ... [o]pposes a legally qualified candidate[,] ... the licensee shall, with[in] 24 hours after the editorial, transmit to [the endorsed or opposed candidate] ... (A) [n]otification of the date and the time of the editorial, (B) [a] script or tape of the editorial and (C) [a]n offer of reasonable opportunity for the candidate or a spokesman of the candidate to respond over the licensee's facilities.

47 C.F.R. § 73.1930(a).

**3.** Although *Red Lion* has been "the subject of intense criticism," it is still binding precedent. *Time Warner Entertainment Co. v. FCC,* 105 F.3d 723, 724 n. 2 (D.C.Cir.1997) (Williams, J., joined by Edwards, C.J., and Silberman, Ginsburg, and Sentelle, JJ., dissenting from denial of rehearing in banc); *see also Branch v. FCC,* 824 F.2d 37, 49–50 (D.C.Cir.1987).

and clarification of *Syracuse's* effect on the personal attack and political editorial rules. And still nothing happened. The FCC's inaction led to a second "petition for expedited rulemaking" in 1990. This petition reiterated that the challenged rules were obsolete and should have been abandoned along with the fairness doctrine, and argued that further delay would be inappropriate. When the FCC still failed to act, RTNDA filed a petition for a writ of mandamus with the court, and thereafter the FCC solicited comments to update the record.[4] The court then denied the mandamus petition "without prejudice to its renewal should the [FCC] fail to make significant progress, within the next six months, toward the possible repeal or modification of the personal attack and political editorial rules." *Radio–Television News Directors Ass'n*, No. 96–1338, 1997 WL 150084 (D.C.Cir. Feb.7, 1997).

In August 1997, the FCC issued a public notice stating:

> After extensive discussion and consideration of various alternatives, a majority of the Commission is unable at this time to agree upon any resolution to the issues presented in this docket. The Commissioners expect to issue statements setting forth their respective views on this matter.

*Public Notice,* 12 F.C.C.R. 11,956, 11,956 (Aug. 8, 1997). Commissioners Quello and Chong voted to repeal the rules, while Chairman Hundt and Commissioner Ness voted for further inquiry. A second mandamus petition followed. During the pendency of this second petition, the FCC issued a second public notice announcing a deadlock among the newly appointed commissioners. *See Public Notice,* 13 F.C.C.R. 11,809 (May 8, 1998). Chairman Kennard recused himself from the proceeding, leaving a 2–2 split with Commissioners Ness and Tristani favoring the sta-

tus quo and Commissioners Furchtgott– Roth and Powell favoring repeal.

In May 1998, the court held that the public notice announcing the deadlocked FCC vote constituted final agency action, and that the commissioners voting against repeal were obliged to submit a statement of reasons to the court in order to facilitate judicial review. *See Radio–Television News Directors Ass'n,* 1998 WL 388796. Except as noted, the court denied the mandamus petition. Commissioners Ness and Tristani submitted a joint statement explaining why they would preserve the rules (hereinafter "the *Joint Statement*"), while Commissioners Powell and Furchtgott– Roth submitted a joint dissenting statement. *See Public Notice,* 13 F.C.C.R. 21,- 901 (June 22, 1998).

## II.

■ Petitioners first contend that the *Syracuse* order of its own force drags the political editorial and personal attack rules down with the fairness doctrine to which they were moored. Essentially, they maintain that the *Syracuse* order actually rescinded the challenged rules, or, if not, that rescission inexorably follows from the reasoning in *Syracuse.*[5] Although the FCC disputes these contentions, it agrees that the fairness doctrine is dead, and that the political editorial and personal attack rules were initially derived, at least in part, from the fairness doctrine.

The *Syracuse* order did not directly rescind the rules challenged here. Not only did the order expressly state that it did not cover the rules, *see Syracuse Peace Council,* 2 F.C.C.R. at 5063 n. 75, but subsequent orders have indicated that the status of corollaries to the fairness doctrine is a question for further review even after *Syracuse. See, e.g., Citizens for a Humane Kansas,* 3 F.C.C.R. 718, 718 n. 1 (1988). We thus need not consider the

---

4.  The FCC concedes in its brief that its "attention was drawn to [the pending] matter by" the mandamus petition.

5.  The dissenting commissioners take the same approach. *See Joint Statement of Commissioners Powell and Furchtgott–Roth* at 5–10.

extent to which an order terminating an adjudication could repeal rules promulgated through notice and comment rulemaking. *Cf. American Fed'n of Gov't Employees Local 3090 v. Federal Labor Relations Auth.,* 777 F.2d 751, 759 (D.C.Cir.1985).

■ Nor, contrary to petitioners' contention, does the demise of the fairness doctrine necessarily lead to the demise of the two rules challenged here. Although there is language indicating that the FCC has viewed the two rules at issue to be part and parcel of the fairness doctrine, *see, e.g., Personal Attacks and Political Editorials,* 8 F.C.C.2d. at 722, the FCC's post-*Syracuse* conduct is consistent with its statement in *Syracuse* that the rules had a life separate and apart from that adjudication. *See Syracuse,* 2 F.C.C.R. at 5063 n. 75. The challenged rules are substantially narrower and more refined than the fairness doctrine, which covered all public issues, rather than a subset of attacks and editorials. A broad rule can be flawed for reasons that do not affect its narrower adjuncts. Thus, it could be theoretically consistent for the FCC to have concluded that the public interest did not require fairness to all views all of the time, but that fairness to particular views in particular circumstances remained desirable. The FCC's decision in *Arkansas AFL–CIO,* 7 F.C.C.R. 541, 541 (1992), *aff'd,* 11 F.3d 1430 (8th Cir.1993) (in banc)—ruling that the requirement for balanced coverage of ballot issues collapsed in 1987 because it was "entirely derived from the fairness doctrine" and therefore governed by *Syracuse*—is not, as petitioners suggest, dispositive; the FCC never codified a separate rule regarding ballot issues and had historically treated ballot coverage requirements as merely a particular incident of the fairness doctrine. *See, e.g., Citizens to Tax Big Oil,* 78 F.C.C.2d 473, 474 (1980). In short, while the challenged rules do not necessarily persist after the fairness doctrine, they need not share its fate.

■ Petitioners' contrary theory relies on an untenably broad understanding of what the "fairness doctrine" encompasses and what is meant by its abrogation. In petitioners' view, new rules added to an existing doctrine become inseparable from the doctrine and must share the doctrine's eventual fate. Yet, when an agency operates under a general standard such as the fairness doctrine, explaining related rules within the framework of the standard is reasonable, even if the new rule is not entirely dependant on the standard or materially modifies the preexisting regulatory environment. Although the order promulgating the political editorial and personal attack rules notes that the rules do not "alter or add to the substance of the [fairness] doctrine," *see Personal Attacks and Political Editorials,* 8 F.C.C.2d 721, 722 (1967), its reliance on the doctrine does not apply in reverse: relying on an obviously relevant doctrine does not mean that the FCC could not or would not have acted had the doctrine not been available. There may have been many reasons to adopt the rules, but justifying them would have been redundant in light of the fairness doctrine. Petitioners therefore take too narrow a view of rulemaking when they contend that repeal of a rule necessarily requires repeal of subsequent rules that relied on the first rule. Rather, rules may have more than one foundation or justification, not all of which may be apparent until a more prominent rationale is challenged, such that repealing a rule that helped to justify a subsequent rule casts doubt on the latter rule, but does not necessarily topple it. Under such circumstances, the agency should have an opportunity to defend its evolving regulatory scheme rather than face automatic judicial invalidation.

Accordingly, given the express notation in *Syracuse* and what has transpired since then, petitioners fail to show that abrogation of the fairness doctrine alone resolves the issues presented in the instant case. The FCC's prior opinions, including *Syracuse,* are relevant to the extent that the

FCC cannot inexplicably act inconsistently with them, *see, e.g., Sangre de Cristo Communications, Inc. v. FCC,* 139 F.3d 953, 958 (D.C.Cir.1998), but they must be applied by analogy and explanation rather than bluntly as dispositive precedent.

## III.

The question remains whether the rules can survive petitioners' challenge in light of the NPRM, the Fairness Report, the *Syracuse* order, and petitioners' contention that changes in the industry since 1967, including an expansion of communications outlets, undermine support for the rules. *See* 5 U.S.C. § 706. We first address two threshold issues, pertaining to the standard of review and the burden of persuasion, and then examine the explanation in the Joint Statement to determine whether retention of the rules is arbitrary and capricious under 5 U.S.C. § 706(2)(A).

## A.

■ First, petitioners contend that, unlike opinions accompanying most agency orders declining to adopt a proposed rule, the reasoning in the Joint Statement does not warrant deference, as the FCC requests, because it does not reflect the FCC's majority view. Rather than review the Joint Statement under the familiar standards of the APA, *see* 5 U.S.C. § 706, petitioners would have us subject the order to some unspecified degree of more intense scrutiny. The court's 1998 order on mandamus rejected the premise of petitioners' contention, holding that a deadlocked vote on a proposal to repeal a rule constitutes reviewable, final agency action in support of the status quo. *See Radio–Television News Directors Ass'n,* 1998 WL 388796.[6] It follows that the court must accord the Joint Statement the same respect normally accorded agency decisions in rulemaking proceedings. Petitioners' repeated refrain that the reviewable Joint Statement is nevertheless not worthy of "deference" misses the point of APA review.

■ Under petitioners' theory, neither of the two joint statements would be entitled to any deference. The court would therefore lack a framework to guide its review; it would be left to pick the position it favored most, in effect becoming a phantom commissioner with power to break ties. Such subjectivity would be inconsistent with the APA's limitation of the court's role, succinctly put, to searching for faults within an agency's reasoning rather than picking a contrary outcome that it prefers over an otherwise permissible agency decision. *See* 5 U.S.C. § 706. Petitioners' novel theory of deference would also seemingly flout the *Chenery* doctrine, which limits the court's review of an order to the rationales advanced by an agency and would bar the free-form review that petitioners apparently seek. *See SEC v. Chenery Corp.,* 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626 (1943). Furthermore, petitioners' view overlooks the fact that settled agency rules are entitled to a presumption of validity such that failure to repeal them has some inherent justification; otherwise, regulatory schemes would be dangerously unstable. *See, e.g., Motor Vehicle Mfr. Ass'n v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 41–42, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). If the force of the two dissenting commissioners' views was insufficient to sway their colleagues, there is no reason why the mere fact of the dissent should erase the presumption of validity that the agency's order would normally receive.[7]

---

**6.** This holding is law of the case. *See La-Shawn v. Barry,* 87 F.3d 1389, 1393 (D.C.Cir. 1996) (in banc).

**7.** Petitioners RTNDA and NAB cite *Oil, Chemical & Atomic Workers Int'l Union v. NLRB,* 46 F.3d 82, 92 (D.C.Cir.1995), for the proposition that a theory endorsed by only 2 of 4 commissioners does not warrant deference. However, in that case a fractured board developed distinct rationales for its decision interpreting and applying the Labor Management Relations Act, and the court therefore could not discern the policy that it was being

■ Second, we reject the FCC's contention that petitioners bear the burden of explaining why the rules are not in the public interest. The FCC's attempt to minimize its burden might be appropriate if petitioners were appealing from denial of a petition for a rulemaking to repeal an existing rule. *See, e.g., American Horse Protection Ass'n v. Lyng,* 812 F.2d 1, 4–5 (D.C.Cir.1987). But having initiated a rulemaking premised on the conclusion that the rules may not be in the public interest and then rejected its own proposal to abrogate the rules, the FCC bears a burden of explanation. *Cf. Geller v. FCC,* 610 F.2d 973, 979–80 (D.C.Cir.1979).

## B.

The FCC appears to acknowledge its duty to explain the reasons for its action, noting in the Joint Statement that:

> In the end, our task in this proceeding, just as it was in our review of the fairness doctrine, is to "make predictive and normative judgments" about the benefits and the burdens resulting from the two rules, and ultimately to determine whether the benefits outweigh the burdens. In our judgment this calculus leads us to a different result than the one reached by the prior Commission with respect to the fairness doctrine given the different considerations raised by the political editorial and personal attack rules.

*Joint Statement* at 24 (footnotes omitted). Yet, to the extent the FCC employed some

sort of "calculus," its analysis in the Joint Statement is opaque, relying on broad policy statements to justify much narrower rules despite having recently rejected similar policies in a related context. With only minor modifications, the rationales discussed in the Joint Statement could have been used, verbatim, to defend the fairness doctrine. In short, the FCC's analysis in the Joint Statement bears little relation to the FCC's present and past actions.

■ For the sake of argument, we will assume that the Joint Statement correctly negates the charge that the rules chill protected expression, impose undue administrative burdens on broadcasters, and have been rendered obsolete by the proliferation of new media technologies and outlets. Even so, the rules to some degree interfere with the editorial judgment of professional journalists and entangle the government in day-to-day operations of the media. The Supreme Court and the FCC have noted that both effects are cause for concern, though not fatal in moderation. *See Arkansas Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 118 S.Ct. 1633, 1639–40, 140 L.Ed.2d 875 (1998); *FCC v. League of Women Voters,* 468 U.S. 364, 378, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984); *CBS v. Democratic Nat'l Comm.,* 412 U.S. 94, 110, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973); *see also Syracuse Peace Council,* 2 F.C.C.R. at 5051–52; NPRM, 48 Fed.Reg. at 28298; *Fairness Report,* 102 F.C.C.R. at 190–92.[8] Because the FCC is bound to regulate in the public interest,

asked to review. *See id.* at 85. Here, the policy under review is clearly discernable and operates of its own force until repealed. Moreover, the remedy in *Oil, Chemical & Atomic Workers* was a remand to establish a consensus, not *de novo* review. *Id.* at 92. A remand in the instant case to force consensus would be pointless given the docket's lengthy history and the commissioners' diametrically opposed positions.

RTNDA and NAB also note that because the FCC concedes that the order is not binding precedent in future FCC cases, it likewise should not be entitled to deference by the court. This argument again misses the point

of APA deference. In any event, there is no inconsistency from the perspective of the court between permitting the FCC to supplant rules achieved by deadlock with majority rules and respecting the FCC's work-product, whether the result of deadlock or majority vote.

8. Outside the broadcast context, a regulation requiring a media outlet to provide a right of reply to victims of personal or political attacks would face more severe First Amendment constraints. *See Miami Herald Publ'g Co. v. Tornillo,* 418 U.S. 241, 256–58, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974).

*see* 47 U.S.C. §§ 307(a), 309(a) (1994), it must explain why the public would benefit from rules that raise these policy and constitutional doubts; yet the Joint Statement fails to present an adequate basis upon which to affirm retention of the rules and dispel concerns previously raised by the FCC itself. Although the Joint Statement recites that the rules "serve as important components of a broadcaster's public interest obligations," *Joint Statement* at 2, it does not persuasively explain, in light of FCC precedent, why this is so or why less intrusive alternatives would be less desirable.

■ The first theory offered in the Joint Statement is that the "rules serve the public interest by helping to ensure that the same audience that heard the broadcast of an endorsement or personal attack be accessible to the individual concerned." *Id.* The theory relies on an unstated premise that the public has a clear interest in hearing both sides of each issue on which a broadcaster elects to focus. The premise is no doubt sound. But, in abrogating the fairness doctrine, the FCC rejected the notion that this interest automatically justifies government intervention in the editorial processes of broadcasters. *See Syracuse Peace Council,* 2 F.C.C.R. at 5050–52. The rules therefore make sense only if there is a special interest, greater than the general interest addressed by the now-discarded fairness doctrine, in hearing responses to political editorials or personal attacks. The Joint Statement offers no such explanation. Although repeal of the fairness doctrine could in theory have left the challenged rules intact, the Joint Statement never presents a plausible explanation why political editorials and personal attacks are sufficiently meaningful to warrant regulation when other kinds of topics, editorials, and attacks do not. The FCC generally need not explain why it has declined to regulate something in order to justify a particular rule, but having expressly decided to repeal broad rules, it

must explain why retaining similar (albeit narrower) rules is appropriate.

Second, the Joint Statement justifies retention of the rules for "precisely the same reasons" as the Supreme Court noted in *Red Lion. Joint Statement* at 4. According to the Joint Statement, these reasons were that, absent the rules, "station owners and a few networks would have unfettered power to make time available only to the highest bidders, to communicate only their own views on public issues, people and candidates, and to permit on the air only those with whom they agreed." *Id.* (quoting *Red Lion,* 395 U.S. at 392, 89 S.Ct. 1794).

■ The quoted language from *Red Lion* appears in the Court's consideration of whether the political editorial and personal attack rules were "inconsistent with the First Amendment goal of producing an informed public capable of conducting its own affairs." 395 U.S. at 392, 89 S.Ct. 1794. The Court concluded that there was no inconsistency. It did not purport, however, to hold that the rules would always be in the public interest. The mere fact that a rule is not unconstitutional does not therefore mean that its perpetuation is not arbitrary and capricious. Accordingly, the Joint Statement is flawed to the extent that it relies on a thirty-year-old conclusion that the challenged rules survive First Amendment scrutiny to justify the decision not to repeal them in the face of modern challenges to the rules' consistency with the FCC's regulatory mandate.

Moreover, the Joint Statement's quotation from *Red Lion* rings hollow in view of the FCC's repeal of the fairness doctrine. Licensees now have greater opportunities to "make time available only to the highest bidders, . . . communicate only their own views on public issues, people and candidates, and . . . permit on the air only those with whom they agree[ ]." *Id.* The caveat is that they must be careful not to editorialize about candidates and not to allow personal attacks. Such artful evasion of a duty to provide balanced programming

would have been far less possible when the fairness doctrine supplemented the rules challenged here, but is easier to accomplish today. It is therefore difficult to conceive how retention of the rules can be for "precisely" the reasons noted in *Red Lion* when those reasons were offered for a different purpose and in the context of a now defunct regulatory regime.

Third, the Joint Statement notes that the "scarcity of broadcast frequencies provides a rationale for imposing public interest obligations on broadcasters." *Joint Statement* at 9. Even accepting the factual premise of this statement, it provides no support for the specific rules under review. The mere fact that the FCC has the power to regulate broadcasters more intensely than other media does not also mean that it may impose any obligation it sees fit. Each regulation must be in the "public interest," 47 U.S.C. §§ 307(a), 309(a), and none can be "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A). The scarcity rationale does not address either limit on the FCC's discretion.[9]

Fourth, the Joint Statement attempts to justify the challenged rules by reference to its authority under the equal time doctrine, which provides that "[i]f any licensee shall permit any person who is a legally quali-

fied candidate for any public office to use a broadcasting station, he [or she] shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station." 47 U.S.C. § 315(a) (1994); *see also* 47 U.S.C. § 312(a)(7) (1994). According to the Joint Statement, the challenged rules "complement" the "policies" underlying § 315(a).[10] *Joint Statement* at 11. Yet the equal time doctrine does not compel either the political editorial or personal attack rules. Both rules apply when the licensee itself distributes proscribed content, while the statute contemplates situations where the licensee allows a candidate use of the station's facilities. Moreover, the personal attack rule applies to all attacks, not just attacks on candidates. Thus, the challenged rules are substantially broader than the equal time doctrine. This breadth does not invalidate the rules, but it lessens the persuasive force of the Joint Statement's reliance on the statute to justify its decision.[11] This is particularly so because the Joint Statement ignores the fact that the fairness doctrine also complemented § 315(a), illustrating the point that mere consistency with a statute does not justify a regulation; a statutory policy can be implemented in numerous ways, but the agency is limited

9. For the same reasons, the FCC cannot rely solely on the fact that broadcasters are "trustees of the nation's airwaves," *Joint Statement* at 14, even though a trustee has less cause to complain about onerous burdens placed upon it than would an operator of a purely private enterprise. Although the "trustee" theory—which derives from the government's granting of private property rights in public resources—is distinct from theories premised on the scarcity of broadcast spectrum, and may independently justify regulation and reduced First Amendment scrutiny, *cf. Time Warner Entertainment Co.*, 105 F.3d at 724 (Williams J., joined by Edwards, C.J., and Silberman, Ginsburg, and Sentelle, JJ., dissenting from denial of rehearing in banc); *CBS Inc. v. FCC*, 453 U.S. 367, 394–97, 101 S.Ct. 2813, 69 L.Ed.2d 706 (1981), simply reciting that fact cannot justify a particular burden that the FCC imposes.

10. The FCC has developed a related rule that governs cases in which a candidate's support-

ers, rather than the candidate herself, appear on a station. *See Nicholas Zapple*, 23 F.C.C.2d 707 (1970).

11. Contrary to the FCC's view in its brief, *Red Lion* cannot plausibly be read to hold that the statute shields these rules from repeal. In *Red Lion*, the Supreme Court noted that:

When a broadcaster grants time to a political candidate, Congress itself requires that equal time be offered to his opponents. It would exceed our competence to hold that the Commission is unauthorized by the statute to employ a similar device where personal attacks or political editorials are broadcast by a radio or television station. 395 U.S. at 385, 89 S.Ct. 1794. This analysis states only that if the political editorial and personal attack rules are otherwise sound exercises of agency discretion, the statute poses no obstacle to their adoption.

to solutions that are not arbitrary and capricious.[12]

Fifth, the Joint Statement explains that the political editorial rule:

> is intended to provide citizens with the information necessary to enable them to exercise their vote in a more responsible and informed manner. In such respects, we believe that this particular rule goes to the very heart of our democratic electoral process.

*Joint Statement* at 10. Few would disagree with the idea that vibrant debate is good for democracy, but that alone cannot explain why editorials about candidates justify federal intervention when other types of editorials or non-editorial programming does not. The Joint Statement's rationale would justify numerous salutary regulations—including the fairness doctrine—but it offers no explanation for the FCC's choice to impose the ones at issue here. Moreover, the Joint Statement's reasoning fails to address the concern raised in the NPRM that nothing inherent in the nature of an editorial necessitates countervailing speech to ensure balanced debate. *See* 48 Fed.Reg. at 28,300. Many programming decisions add to and detract from the balance within the marketplace of ideas without regulatory consequence, but the Joint Statement never explains why editorials warrant special treatment.

There may be good reasons to focus on political editorials. If broadcasters want to use public resources overtly to push a private agenda by advocating a result in an election, a right of reply might be a mini-mally intrusive means of countering a licensee's government-granted monopoly on access to the resource. The same could be said, however, to defend rights of reply on many issues of public concern.[13] Yet the FCC has emphatically rejected such a broad regulatory regime. It therefore falls on the FCC to explain why editorials about candidates are particularly appropriate subjects for regulation.

Finally, the Joint Statement justifies the personal attack rule by noting that the airwaves should not be a "platform for attacks on personal character," *Joint Statement* at 17, that the rule is targeted to provide a limited right of reply to the same audience that heard the attack, *see id.* at 18, and that the FCC only enforces the rule when a licensee acts in "bad faith," *id.*[14] This defense of the rule may be appealing—personal attacks can be distasteful and detract from reasoned discourse—but it fails to make a sustainable case for the rule. Most troubling is the fact that the Joint Statement ignores the concerns that the FCC raised in the NPRM about the rule's utility. The NPRM notes that newspapers are not bound by a similar right of reply and yet no serious consequences seem to have ensued, that at least some victims (those who are public figures) of personal attacks have sufficient access to broadcast media that a right-of-reply requirement is unnecessary, that the rule does not apply to newscasts and yet its inapplicability does not seem to have led to the problems that the rule is designed to address, that the rationale for

---

**12.** Having rejected the significance of the equal time doctrine, we need not consider petitioners' various contentions that the FCC's reliance on the doctrine comes too late and with insufficient notice.

**13.** For example, the FCC would permit a network to editorialize about tax policy, but would constrain a network's discretion to endorse a particular candidate based on her views about tax policy. Likewise, a network has more freedom to endorse a ballot initiative than to endorse a candidate championing

such an initiative. The FCC has not articulated a basis for the distinction.

**14.** The FCC does not rely on the claim, questioned in its NPRM, that the personal attack rule in and of itself fosters discussion of controversial issues. *See NPRM*, 48 Fed.Reg. at 28,298. The focus now seems to be on addressing the merits of the attack—which the FCC sees as a prerequisite to meaningful debate on substantive topics—rather than on using the reply as a forum for discussion of public policy. *See Joint Statement* at 18–19.

applying the rule to non-news programming was even less sound than applying it to newscasts, and that the FCC lacked any "evidence that personal attacks are inherently more persuasive than other [types of] arguments." *NPRM*, 48 Fed.Reg. at 28,298–99. There may be valid responses to each of these concerns, but the Joint Statement's conclusory assertion that the rule is a necessary prerequisite for balanced debate on public issues is insufficient to allay the doubts that the FCC itself previously raised. Indeed, having in the past conceded that it lacked "evidence" that the rule was necessary, the FCC at a minimum should point to evidence to support the rule or explain why none is needed.[15]

As with the political editorial rule, there may be sound reasons to regulate personal attacks. The problem here, however, is that whether viewed individually or as a whole, the explanations in the Joint Statement do not articulate them.

### C.

■ The foregoing deficiencies in the FCC's analysis render its present explanation of its decision to retain the rules insufficient to permit judicial review.

First, the Joint Statement does not consider "the relevant factors" and therefore does not satisfy the FCC's obligation to explain the reason for its decision. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *see also FEC v. Rose*, 806 F.2d 1081, 1088 (D.C.Cir.1986). After 1987, the instant rulemaking proceeding should have involved distinguishing political editorials and personal attacks, which are regulated, from subjects formerly covered by the fairness doctrine but that have

been deregulated, such as non-editorial political commentary, editorials on political issues aside from candidate endorsements, and non-personal attacks. The FCC is mostly silent on this salient question, choosing in the Joint Statement to rebut specific attacks against the rules rather than articulating a rationale to justify the rules in the first instance. In other cases in which an agency suggests repealing a rule and then elects not to do so, the agency might be able to rely on the rationale it articulated when it first adopted the rule, and devote subsequent orders to defending the rule from attack. Here, however, the original rationale for the challenged rules—the fairness doctrine—has been abrogated, and the NPRM initiating the present proceeding acknowledged that the justification for the rules required an "especially searching" reexamination. 48 Fed.Reg. at 28,298. Under these circumstances, an order declining to repeal a rule must justify the rule despite the fact that the rule was justified when initially promulgated.

■ Second, the FCC's explanation for retention of the rules is inconsistent with prior FCC actions that set a very high standard for the deliberations presently under review. The NPRM stated:

> it is evident that our reexamination of the public interest justification for the personal attack and political editorial rules must be especially searching. Even as a general matter the [Communications] Act requires the Commission to refrain from interfering with licensees' editorial judgements unless such action clearly is required in order to further the Congressional objectives of balanced coverage of public issues. . . .

---

15. In defending the personal attack rule, the Joint Statement notes that "once an individual's credibility is attacked, little credence will be given to his or her views on public issues." *Joint Statement* at 18. Absent record support, this conclusory statement is compelling only if one presumes that audiences are less likely to think critically about personal attacks than other forms of commentary and that they focus extensively on the personal peccadillos of public figures. Neither proposition is obvious. Standing alone, without any elaboration, quantification, or tailoring to the specific rule at issue, it cannot justify a regulation requiring a right of reply.

But where, as here, the rules go beyond general fairness doctrine obligations to impose specific rights [on] broadcast facilities, the statute requires us to proceed with particular caution.

48 Fed.Reg. at 28,298. Likewise, the FCC stated that "we are led to question the public interest justification for the [political editorial] rule," *id.* at 28,299, and imposed upon itself "a particularly heavy burden ... to justify its application." *Id.* at 28,300. Having framed the present rulemaking proceeding in terms of providing a persuasive rationale for a rule that seemed unnecessary, and having retained that framework, the FCC could not simply assume in the Joint Statement a need for the rule and focus on rebutting specific attacks levied against it.[16] *Cf. Geller*, 610 F.2d at 979–80. Such review is hardly "especially searching."

The Joint Statement also does not reflect the significance of the FCC's order in *Syracuse*, as well as the Fairness Report on which that order was based. Although abrogation of the fairness doctrine does not require repeal of the political editorial and personal attack rules, it does establish an agency precedent for declining to use the FCC's power to redress a market failure in provision of balanced coverage of important issues. The exercise of such power may be appropriate in the instant case, but the agency must offer clear, cogent explanations for treating the two cases differently. It is not enough to note that one case is narrower than the other; there must be a reason why the more focused nature of the present rules shields them from the myriad defects that the

FCC recognized in *Syracuse*. *See Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C.Cir.1970). A well-reasoned, carefully documented order affirming the challenged rules could in theory have survived notwithstanding the FCC's vacillation, delay, and deadlock. But these factors counsel against affirming the rules on the highly general foundation provided in the Joint Statement in light of the FCC's prior actions questioning that foundation. *Cf. Meredith Corp. v. FCC*, 809 F.2d 863, 873 (D.C.Cir.1987) ("An agency is not required to reconsider the merits of a rule each time it seeks to apply it.... Here, however, the Commission itself has already largely undermined the legitimacy of its own rule").

Finally, the Joint Statement recognizes that the current rules are broader than their rationales suggest, attempting to justify the rules with explanations that do not correspond with the rules' breadth, and failing to address whether narrower rules would serve the FCC's purposes. For example, the Joint Statement notes that scarcity in local markets justifies a targeted right of reply to local audiences without explaining why this rationale justifies a right of reply for national figures.[17] *See Joint Statement* at 23. Likewise, the Joint Statement frames its discussion of the personal attack rule in terms of the need for individual public officials to salvage their credibility, *see id.* at 17–18, yet the rule applies to personal attacks against all persons and groups, not just government officials. Normally, the FCC need not refute all alternative solutions to the problems it addresses in rulemakings so long as its

---

16. The NPRM does not bind the FCC, which is free to adopt a contrary position after consideration of public comments. *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 845, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986). However, the NPRM frames the rulemaking proceeding, such that failure to consider the concerns that animated the rulemaking casts doubt on the reasonableness of the agency's decisionmaking process. *Cf. Natural Resources Defense Council, Inc. v. SEC*, 606 F.2d 1031, 1049 n. 23 (D.C.Cir.1979).

17. For example, the fact that a national news network rarely covers local state assembly races may explain why a right of reply is necessary on a local network affiliate for a state assembly candidate maligned by that affiliate, but it does not follow that the local affiliate must also be the venue for a right of reply involving a presidential candidate.

own solution is "not irrational," *Loyola Univ. v. FCC*, 670 F.2d 1222, 1227 (D.C.Cir.1982), but having highlighted the apparently excessive breadth of its rules, and indicated a receptiveness to narrowing the rules, the FCC was obliged to explain in the Joint Statement why the rules were nevertheless desirable without modification.[18]

Consequently, as a matter of administrative law, the court cannot affirm the FCC's order. Neither, however, is the court in a position to hold on this record that the challenged rules are inconsistent with the public interest or the First Amendment. The FCC's failure to address relevant factors, distinguish applicable precedents, and explain the scope of its rules despite acknowledging that the rules might be too broad renders meaningful judicial review impossible because the court lacks a coherent rationale against which to weigh petitioners' factual, policy, and constitutional claims. Petitioners' claims each require the court to balance the rationale for the rules against their consequences.[19] In theory, balancing could be avoided if the rules so obviously entailed no ill effects that they would survive even if only marginally useful. That, however, is not the case, as illustrated in the NPRM and the Fairness Report. Even were the court to assume that some of petitioners' arguments are overstated,[20] the challenged rules by their nature interfere with at least some journalistic judgment, chill at least some speech, and impose at least some burdens on activities at the heart of the First Amendment. Because the court must weigh the rules' benefits against their burdens, the inadequacy of the explanation in the Joint Statement is apparent. Wooden application of principles underlying rhetoric about the FCC's vast power, its broad discretion, and the importance of vibrant debate in democracy to a specific set of rules would force the court to adopt an impressionistic approach that would disserve the parties and muddle the First Amendment analysis. The FCC must therefore explain its rationale for these rules in more detail, thereby permitting the court to test that rationale against petitioners' factual assertions and, if necessary, the demands of the First Amendment.

## IV.

As explained in Part II, there is nothing inherently inconsistent about preserving the two challenged rules despite abrogation of the fairness doctrine. Although the arguments that the FCC found persuasive in *Syracuse* and the Fairness Report apply on their face to the two challenged rules, petitioners have not explained why the FCC would be incapable, within the bounds of its discretion and expertise, of distinguishing the present context from what it confronted in *Syracuse*. Although we hold that the FCC adopted far too

---

**18.** The Joint Statement expressly states that modification of the rules would be appropriate to align more closely regulatory burdens with regulatory purposes. *See Joint Statement* at 1, 15–16, 20. The record does not indicate that the FCC has taken any steps toward that end.

**19.** The First Amendment "requires a critical examination of the interests of the public and broadcasters in light of the particular circumstances of each case." *League of Women Voters*, 468 U.S. at 381, 104 S.Ct. 3106. Although *Red Lion* affirmed the rules challenged here, the Court recognized that changed circumstances might be salient in future cases. *See Red Lion*, 395 U.S. at 393,

89 S.Ct. 1794. Also, the Court since *Red Lion* has increasingly focused on the editorial discretion of broadcasters, *see, e.g., Arkansas Educational Television Comm'n*, 118 S.Ct. at 1639, indicating that while the *Red Lion* framework may still be good law, its application to the instant rules may require updating. *See also Fairness Report*, 102 F.C.C.2d at 156 (critiquing the scarcity rationale).

**20.** We note that while the Joint Statement expressly rejects a 1982 survey cited by petitioners that relied on old and possibly flawed data to show a chilling effect on editorializing, the FCC offered no updated or more credible information to the contrary. *Joint Statement* at 14.

sanguine a view of its burden of persuasion, and relied in part on overly broad arguments that appear to ignore its prior analysis of the challenged rules and of the fairness doctrine, the inadequacy of the FCC's order precludes meaningful judicial review of petitioners' claims that the rules on the merits cannot survive; we therefore do not reach such claims.

There is a fine line between agency reasoning that is "so crippled as to be unlawful" and action that is potentially lawful but insufficiently or inappropriately explained. *Checkosky v. SEC*, 23 F.3d 452, 464 (D.C.Cir.1994) (opinion of Silberman, J.). In the former circumstance, the court's practice is to vacate the agency's order, while in the later the court frequently remands for further explanation (including discussion of relevant factors and precedents) while withholding judgment on the lawfulness of the agency's proposed action. *See id.* at 463–64; *International Union, United Mine Workers of America v. Federal Mine Safety & Health Admin.*, 920 F.2d 960, 966–67 (D.C.Cir. 1990).[21] Remand is generally appropriate when "there is at least a serious possibility that the [agency] will be able to substantiate its decision" given an opportunity to do so, and when vacating would be "disruptive." *Allied–Signal, Inc. v. United States Nuclear Regulatory Comm'n*, 988 F.2d 146, 151 (D.C.Cir.1993).

Here, two commissioners and some commentators, including intervenors and amici,[22] maintain that the rules continue to serve an important purpose, and the FCC may uphold them again once it conforms its analysis to the principles discussed in Part III. Whether the newly-defended rules would survive judicial review is an open question, but is sufficiently possible to justify remand rather than a more severe remedy. The delay and deadlock in this case may militate in favor of final resolution now, *see Checkosky v. SEC*, 139 F.3d 221, 226 (D.C.Cir.1998), but because the rules have been in force for more than thirty years, the more prudent course is to leave the present regulatory regime in effect and order the FCC to provide a more detailed defense—and possibly modifications as well—sufficient to permit meaningful judicial review. The FCC retains discretion to commence a new rulemaking, or to reopen the record, to ensure that it fully accounts for relevant factual and legal developments since 1983, *cf. United Mine Workers v. Dole*, 870 F.2d 662, 674 (D.C.Cir.1989), but is not compelled to do so.[23] In any event, the FCC on remand must address at least the concerns it raised in its NPRM, the Fairness Report, and the *Syracuse* order, and must supplement its analysis with record evidence showing a fit between its policy preferences and the actual communications market in which the rules operate.

**21.** Unlike in the cited cases, petitioners here request that the court do more than set aside the order under review (which would leave the status quo intact), contending that the court should "direct the Commission" to "eliminate" or "repeal" the personal attack and political editorial rules. Because the court remands, we need not address the full scope of our remedial authority in cases where an agency order in a rulemaking initiated to consider repealing or modifying an existing rule fails to justify the rule.

**22.** *See* briefs filed by the Media Access Project on behalf of intervenors—the Office of Communication, Inc., of the United Church of Christ, the Center for Media Education, the Washington Area Citizens' Coalition Interest-ed in Viewers' Constitutional Rights, Peggy Charren, and Henry Geller—and by amicus curiae Safe Energy Communication Council. The briefs emphasize the rule's early origins, the viability of a scarcity rationale, and the importance of the rules to assure balanced coverage of local election issues.

**23.** A new rulemaking, accomplished expeditiously, would permit the FCC to work from a relatively clean procedural slate, consider modern factual and legal developments, and obtain comments on specific proposals to modify the rules. In practice, this might be the preferred way to create a record capable of rebutting petitioners' attacks, but we leave to the FCC the decision of how to proceed on remand.

Accordingly, we grant the petitions for review and remand the case to afford the FCC an opportunity to provide an adequate justification for retaining the personal attack and political editorial rules, and for such proceedings as the FCC may determine are appropriate to implement this mandate. Given its prior delay in this proceeding, the FCC need act expeditiously. *See United Mine Workers,* 920 F.2d at 967.