# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued February 4, 2021        Decided May 28, 2021

No. 20-1058

WESTERN COAL TRAFFIC LEAGUE,
PETITIONER

v.

SURFACE TRANSPORTATION BOARD AND UNITED STATES OF
AMERICA,
RESPONDENTS

---

On Petition for Review of Orders
of the Surface Transportation Board

---

*William L. Slover* argued the cause for petitioner. With him on the briefs were *John H. LeSeur* and *A. Rebecca Williams*.

*Erik G. Light*, Attorney, Surface Transportation Board, argued the cause for respondents. With him on the joint brief were *Michael F. Murray*, Deputy Assistant Attorney General, U.S. Department of Justice, *Robert B. Nicholson*, Attorney, *Craig M. Keats*, General Counsel, Surface Transportation Board, and *Anika S. Cooper*, Deputy General Counsel. *Kathleen S. Kiernan*, Attorney, U.S. Department of Justice, entered an appearance.

Before: SRINIVASAN, *Chief Judge*, WILKINS, *Circuit Judge*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

Dissenting opinion filed by *Circuit Judge* WILKINS.

SILBERMAN, *Senior Circuit Judge*: The Surface Transportation Board deadlocked 1–1–1 on what, if anything, to do about an existing rule governing rail carrier fuel surcharges. After five years with no majority position on how to proceed, the Board unanimously voted to discontinue its Advanced Notice of Proposed Rulemaking (ANPRM) in the interest of administrative finality. Petitioner Western Coal Traffic League brings various arguments as to why the Board's action was unreasonable. But since the League lacks standing, we dismiss its petition.

**I**

The Surface Transportation Board is charged with oversight of the freight rail industry. It regulates carrier "rates" and "practices." 49 U.S.C. § 10702. Although the Board's regulation of *rates* is dependent on a determination that a rail carrier "has market dominance," *id.* § 10707(b), regulation of *practices* does not require any such finding. At full strength, the Board is composed of five members nominated by the President and confirmed by the Senate. *Id.* § 1301(b)(1). Members serve five-year terms, subject to for-cause removal. *Id.* § 1301(b)(3).

This petition concerns a Board Rule governing "fuel surcharges," or charges that rail carriers impose to recover increases in fuel costs. Two decades ago (in response to rising fuel prices), rail carriers began to assess fuel surcharges as a

separate, added percentage on top of the base rate for transportation. Shippers challenged the surcharges before the Board, arguing that imposing "fuel surcharges" was an unreasonable practice. Because the base rate is determined by market forces—not simply carrier costs—imposing the surcharge over the base rate as a fixed percentage, in the shippers' view, resulted in overcharges for fuel.

In response to the shipper's complaints, the Board adopted a rule requiring carriers to calculate fuel surcharges based on factors tied to the movement of goods—e.g., mileage and weight—rather than a percentage over the base rate. *Rail Fuel Surcharges*, Ex Parte No. 661, 2007 WL 201205, at *4 (S.T.B. Jan. 25, 2007) ("the Rule"). The Board further specified that a fee may not be called a "fuel surcharge" if it recovers more than the carrier's actual fuel costs (carriers can still impose profit-generating fees under a different label). *Id*. Nevertheless, the Board also adopted a "safe harbor" fuel index that shippers could use to approximate actual changes in fuel prices. *Id*. at *8. To calculate a "fuel surcharge," rail carriers could rely on changes in the safe harbor index (even if doing so generates a profit) instead of determining the actual change in fuel costs.[1]

Over time, the Board perceived a potential problem with its safe harbor provision. In *Cargill, Inc. v. BNSF R. Co.*,

---

[1] Because the Rule addresses "the manner in which railroads apply what they label a fuel surcharge" instead of the "the total amount a rail carrier can charge," the Rule purports to be a *practice* regulation and not a *rate* regulation. *Rail Fuel Surcharges* at *4–5. *But see infra* at 7 (Board Members questioning that premise). And since the Rule regulates fuel surcharges as a practice (not a rate), it need not find that a carrier has market dominance before declaring a surcharge unreasonable. *See Rail Fuel Surcharges* at *4–5. The regulation of rail fuel surcharges as a practice does not affect a shipper's ability to bring a challenge to the total rate. *See id.*

Docket No. NOR 42120, 2013 WL 4067719 (S.T.B. Aug. 9, 2013), the defendant carrier had implemented a mileage-based fuel surcharge formula based on the safe harbor index. But the defendant's actual incremental fuel costs were far lower than its fuel surcharge (to the tune of some $181 million over five years). *Id*. at *11.[2] The Board explained that this result could be attributed to a growing spread between index fuel prices and the carrier's de facto fuel prices. As the Board noted, the safe harbor index was designed to allow railroads to recover incremental fuel costs—not to generate significant added revenue. Yet, since the defendant carrier complied with the safe harbor provision, the Board could not conclude that the carrier's practice was unreasonable.

Still, the Board noted that this result "raised concerns about the safe harbor," explaining that the safe harbor "provides rail carriers with an unintended advantage" by offering them a choice. *Id*. at *14. If the change in actual fuel costs is greater than the change in the safe harbor index, a railroad can revise its fuel surcharge program to recover actual costs. But if the change in the index is greater than the change in actual costs, the safe harbor allows a railroad to collect a profit that cannot be challenged as an unreasonable practice. *Id.* Accordingly, "[b]ecause it is possible this aspect of the safe harbor provision could lead to future abuse" the Board stated its intention to "issue an [ANPRM] to give shippers, rail carriers, and other interested parties the opportunity to comment on the safe harbor, including whether it should be modified or removed." *Id*.

---

[2] In comments to the agency, the League asserted that between 2011 and 2013, two large carriers (BNSF and the Union Pacific Railroad Company) collected safe harbor-based profits of over $846 million. J.A. 169–70, 210, 271–73.

As promised, the Board issued a broad ANPRM to facilitate evaluation of the existing safe harbor provision:

> We are seeking comments from the public on whether the safe harbor provision of *Fuel Surcharges* should be modified or removed. In particular, we seek comments on: [1] whether or not the phenomenon that we observed in *Cargill* (a growing spread between a rail carrier's internal fuel costs and the [Safe Harbor] Index) was likely an aberration; [2] whether there are problems associated with the Board's use of the [Department of Energy's] Index as a safe harbor in judging the reasonableness of fuel surcharge programs; [3] whether any problems with the safe harbor could be addressed through a modification of it; and [4] whether any problems with the safe harbor are outweighed by its benefits. Parties are also encouraged to comment on any other matter that they believe bears on whether the safe harbor should be modified or removed.

*Rail Fuel Surcharges (Safe Harbor)*, No. EP 661 (SUB-No. 2), 2014 WL 2217800, at *2 (S.T.B. May 22, 2014).

Five years after the close of the ANPRM comment period, the Board discontinued the *Safe Harbor* docket.[3] The Board's

---

[3] Both Congress and Petitioner expressed their frustration with the Board's delay in the interim period. In the *Surface Transportation Board Reauthorization Act of 2015*, Pub. L. 114–110 (2015), Congress required the Board to issue progress reports on certain "major" unfinished regulatory proceedings. 49 U.S.C. § 1304 note. It also expanded the Board's membership "from three

decision described the history of the safe harbor index as well as noted the various perspectives contained in the 15 comments and 10 replies that it received. Those comments were varied; some commentors supported repeal of the safe harbor, some advocated for keeping it as is, and still others suggested keeping the safe harbor in some modified form. Similarly, the commenters did not agree on whether the *Cargill* issue was an aberration, whether there was enough information to answer that question, or whether *Cargill* represented an advantage or disadvantage of the Rule.[4] The Board then succinctly stated:

> Since the comment period closed in 2014, the Board has been unable to reach a majority decision on what additional Board action should be taken in response to the comments received. Because of the lack of a majority opinion and in the interest of administrative finality, the Board Members agree that this docket should be discontinued.

*Safe Harbor*, No. EP 661 (SUB-No. 2), 2019 WL 4127256, at *2 (S.T.B. Aug. 28, 2019).

members to five in order to address inefficient quorum requirements." S. Rep. No. 114-52 at 11 (2015); *see* 49 U.S.C. § 1301(b). Petitioner filed a mandamus petition in this Court to compel the Board to act. *See* Petition For Writ of Mandamus, *In re W. Coal Traffic League*, No. 19-1080 (D.C. Cir. Apr. 4, 2019). But once the agency discontinued its rulemaking docket, we granted the Board's unopposed motion to dismiss the mandamus petition as moot.

[4] The dissent calculates the comments, assuming the number in support or opposition is relevant. *But see Nat. Res. Def. Council, Inc. v. EPA*, 822 F.2d 104, 122 (D.C. Cir. 1987) ("[A]gency rulemaking is [not] a democratic process by which the majority of commenters prevail by sheer weight of numbers.").

Each of the Board's three members published separate statements explaining their preferred course of action. Board Chairman Ann Begeman explained her view that the safe harbor provision is "misguided" and should be repealed. *Id*. at *3. Board Member Martin Oberman would reverse the *Rail Fuel Surcharges* Rule in its entirety—not just the safe harbor provision. In his view, the Rule is really an impermissible rate regulation (as opposed to a practice regulation). *Id*. at *4. Board Member Patrick Fuchs thought the Rule suffered from internal tensions—if it was not self-contradictory. And he would not risk "exacerbating" those tensions "by modifying or removing the safe harbor provision." *Id*. at *3. Citing reliance interests, Fuchs went on to explain that he would not reverse the entire Rule but would instead advance reforms to how the Board evaluated overall rates. *Id*. at *4.

The League sued to set aside the Board's termination of the ANPRM as arbitrary and capricious. Although Petitioner did not explicitly indicate what it thought would ensue if it prevailed, it seems that the League expected that such an order would lead to a continuation of the rulemaking process. In any event, in light of the Board's deadlock, we asked the Parties to explain how any order from this court would offer Petitioner relief. In other words, is Petitioner's injury redressable? [5]

---

[5] After this Petition was filed, two additional members of the Board were appointed, bringing it to full strength—which, of course, gives Petitioner a new avenue for relief. Although we questioned the Parties about whether this development rendered the dispute moot, we need not address that issue since the League lacks standing.

**II**

Petitioner argues that the Board acted unreasonably by deadlocking. It contends that an impasse "does not excuse an agency from issuing a 'well-reasoned' merits decision that considers 'the relevant factors.'" Pet'r Br. 25 (citing *Radio Television News Dirs. Ass'n v. FCC*, 184 F.3d 872, 885–86 (D.C. Cir. 1999)). The Board counters that dismissal for deadlock was entirely proper.

We think Petitioner lacks standing. It is obvious that the League alleges an injury-in-fact: The costs of shipping are supposedly too high. Causation is also easily met because the Board's safe harbor provision, coupled with the Board's failure to issue a rule that would modify or eliminate that provision, plausibly created the higher rates. Petitioner's problem is the third standing requirement, redressability. To satisfy that requirement, the asserted injury must be "capable of resolution and likely to be redressed by judicial decision." *Sierra Club v. EPA*, 755 F.3d 968, 973 (D.C. Cir. 2014). Here, Petitioner's claim is not capable of resolution through a judicial decision because we lack the power to issue an order to break the Board's deadlock.

The Board is deadlocked over the whole question as to what, if anything, it should do about fuel surcharges. That issue—as is true of all relevant policy decisions—is delegated to the agency, not our court. We certainly lack authority to order any individual Board Member to change his or her policy position. Yet, Petitioner implicitly asks us to compel the Members to reach agreement—akin to (but even exceeding the bounds of) an *Allen* charge that a district judge might issue to a deadlocked jury. But a federal administrative agency is not a jury; it is an organ of a coequal branch of government. We are without power to issue an order to break the deadlock.

According to the dissent, the Board should "hire consultants [or] hold hearings" as a prod to break the deadlock. Dissent at 8. That seems to us to be an imposition of added procedures exceeding the APA's requirements. *See Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 543–545 (1978). In addition to imposing new procedures, the dissent's solution doesn't respect the Board's autonomy. In any event, given the five-year deadlock, the dissent's prescriptions are a recipe for the continued spinning of wheels.

Those suggestions highlight a fundamental disagreement that we have with the dissent. Of course, a favorable decision must be "likely to [] redress[]" the asserted injury. *E.g.*, *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982). (Or, assuming a procedural injury, "some possibility" of redress, *see Massachusetts v. EPA*, 549 U.S. 497, 517 (2007).) This inquiry normally overlaps with causation, since correcting the conduct that causes an injury typically solves the problem. But rarely—as in this case—causation is satisfied but redressability is not. That is because the requested relief is itself an authority we do not possess. *See e.g.*, *Frothingham v. Mellon*, 262 U.S. 447, 489 (1923); *cf. Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (plurality) (separating out the "thornier standing question" of whether the judicial power extends to injunctive relief against the President).

Admittedly, we remanded to a deadlocked agency in *Radio-Television*. 184 F.3d 872. In that case, the FCC (after fifteen years of attempted rulemaking and two mandamus petitions) deadlocked 2–2 on its proposal to repeal personal attack and political editorial rules. Without addressing our jurisdiction—and without objection from the Commission—

we issued an unpublished opinion requiring the two commissioners voting against repeal to explain their rationale in a joint statement. 159 F.3d 636 (D.C. Cir. 1998) (unpublished table decision). Later finding that court-mandated explanation inadequate, we vacated the joint statement and remanded to the Commission for further deliberation. 184 F.3d at 880–89. After the deadlock persisted for an additional two years, we issued a writ of mandamus directing the Commission to immediately repeal its rules. 229 F.3d 269, 272 (D.C. Cir. 2000).

*Radio-Television* does not stand for the proposition that we have the general power to break agency deadlocks. It is crucial to recognize that case does not constitute a precedent on jurisdiction because it failed to address that question. *See Lewis v. Casey*, 518 U.S. 343, 352 n.2 (1996) ("[T]he existence of unaddressed jurisdictional defects has no precedential effect.").

Even if it had contemplated jurisdiction, *Radio-Television* should be distinguished. There, the FCC had "imposed upon itself a particularly heavy burden" to justify its existing rules. 184 F.3d at 886 (internal quotation and citation omitted). In light of the Commission's elimination of the fairness doctrine (on which the attack and editorial rules were predicated), the FCC had previously articulated that its rules *would* be repealed *unless* it could articulate a good reason to keep them. We explained that the FCC had, rather uniquely, "framed the [] rulemaking proceeding in terms of providing a persuasive rationale for a rule that seemed unnecessary" (if not illegal). *Id.* (internal quotations and citations omitted). And, having taken on this heavy burden, we saw no problem with holding the agency to its self-imposed standard. But in the present case, the Board has accepted no such heightened burden, and an agency decision to dismiss an ANPRM is entitled to "very

substantial" deference. *Consumer Fed'n of Am. v. Consumer Prod. Safety Comm'n*, 990 F.2d 1298, 1304–05 (D.C. Cir. 1993).

\*   \*   \*

Creatively, Petitioner presents us with two arguments that indirectly attack the deadlock: (1) We should review the individual statements of the Board Members and conclude that two of the three are arbitrary and capricious (the third apparently agrees with Petitioner), and (2) the whole Board's failure to answer one of the four questions it posed in its ANPRM—whether the *Cargill* decision was an "aberration"—was itself unreasonable. "With that answer in hand," the League explains, the Board "could turn to rationally address the issue of whether it should modify or eliminate the safe harbor." Pet'r Br. 24.

The first alternative argument is quite out of bounds. We exercise judicial review only over the actions of *the Board*, not over the substance of the views of the individual commissioners. *Compare* 28 U.S.C. §§ 2321(a), 2342(5) (authorizing our review of "rules, regulations, or final orders" of the "Surface Transportation Board") *with* 49 U.S.C. § 1306(b)(3) (An individual Board Member "is entitled to express the views of that individual."). After all, when we review the actions of a collective body such as the Board, "it is its institutional decisions—none other—that bear legal significance." *Pub. Serv. Comm'n v. Fed'l Power Comm'n*, 543 F.2d 757, 776 (D.C. Cir. 1974).[6] In this sense, the separate

---

[6] We acknowledge that we have required the joint statements of members of the Federal Election Commission when that agency deadlocks and thereby dismisses a complaint contrary to the

statements of the Board Members are akin to concurring (or dissenting) opinions of judges. And of course, a judge's separate statement cannot be imputed to an opinion of the court. So too administrative decisions must be equally respected. *See United States v. Morgan*, 313 U.S. 409, 422 (1941).

To be sure, we could examine the separate statements for the limited purpose of determining whether an agency's members have acted in bad faith. *See San Luis Obispo Mothers for Peace v. U.S. Nuclear Regul. Comm'n*, 789 F.2d 26, 44–45 (D.C. Cir. 1986) (en banc). But that proposition does not extend to empowering a court to determine whether the positions of individual commissioners are reasonable. In this respect, the situation is similar to our refusal to consider internal deliberations that lead to the decision of a single head of a department or agency. We would permit such an inquiry only if faced with a strong showing of bad faith, which

recommendation of its General Counsel. *See Democratic Cong. Campaign Comm. v. Fed. Election Comm'n*, 831 F.2d 1131, 1133 (D.C. Cir. 1987); *Common Cause v. Fed. Election Comm'n*, 842 F.2d 436, 449 (D.C. Cir. 1988) ("[I]mportant statutory policies [are] served by requiring an explanation for deadlock dismissals contrary to the recommendation of the General Counsel."). In that situation, we review the joint statement of the "controlling commissioners" who would decline to proceed as the rationale of the Commission (a practice that we have characterized as a "fiction raising problems of its own."). *Citizens for Resp. & Ethics in Washington v. Fed. Election Comm'n,* 892 F.3d 434, 437–38 (D.C. Cir. 2018). Here, however, we have no "controlling commissioners"—each Board Member would act differently. *See id*. at 438 n.4 (rhetorically asking, "What if the three [FEC] Commissioners each expressed a different reason for voting against enforcement proceedings?"). Neither do we have a contrary recommendation of the agency's general counsel, nor are the same "statutory policies" at play. Therefore, we don't think our FEC precedents bear on our case.

Petitioner does not argue is present here. *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). Indeed, there is not a shred of evidence to suggest that the Members' irreconcilable policy differences are somehow artificial or not in good faith.

We turn to Petitioner's other alternative argument, that the Board acted unreasonably when it did not consider whether the *Cargill* decision was an "aberration." Although our review is highly deferential, it is true that we have required agencies (in the absence of a deadlock) to provide satisfactory explanations for the dismissal of a rulemaking docket. *See, e.g.*, *Consumer Fed'n of Am. v. Consumer Prod. Safety Comm'n*, 990 F.2d 1298, 1305–08 (D.C. Cir. 1993). If not, we have set aside the agency's dismissal for it to adequately determine whether to continue the rulemaking. *Williams Nat. Gas Co. v. FERC*, 872 F.2d 438, 450 (D.C. Cir. 1989). Petitioner's view is not just that the deadlock is a problem, but that the agency failed to consider an important aspect of the problem. Overcoming the impasse, according to Petitioner, directly flows from appropriate consideration of the *Cargill* issue.

This argument is a distinction without a difference. In effect, the League attempts to end run the Board's deadlock. Petitioner's focus on *Cargill* is clever but rather arbitrary. After all, it was only one of four issues the Board mentioned in its ANPRM. And it is wholly speculative, assuming the Board would conclude that *Cargill* is not an aberration, that the Board would come to an agreement on what to do about fuel costs, and then reach an accord—after five years of impasse—about whether to modify the rule. The Board did not tell us that it was at loggerheads about *Cargill*—it was at loggerheads about *what to do* about the fuel surcharges problem all together.

Assuming we could review the Board Members' separate statements as evidence in our jurisdictional inquiry, those statements confirm that considering *Cargill* would make no difference.[7] It is not apparent how consideration of the aberration issue would influence any Board Member's vote.

It will be recalled that Chairman Begeman wished to repeal the safe harbor rule—and would thus give Petitioner the result it seeks. The views of Board Members Oberman and Fuchs, on the other hand, turn on their legal analysis, not the factual question of whether *Cargill* is an aberration. Board Member Oberman would reverse the Rule in its *entirety*—not just the safe harbor provision. In his view, challenges to fuel surcharges are really objections to the reasonableness of the overall rate. Such challenges must, as a matter of law, be brought as a rate challenge rather than a practice challenge. Board Member Fuchs similarly would not risk "exacerbating" the tension between the Board's standard of review for rail surcharges (as a practice) and the standard of review for rates (requiring market dominance) by eliminating or modifying the safe harbor.

The dissent agrees with Petitioner's *Cargill*-centric argument, reasoning that "[h]ad the Board acknowledged the

---

[7] Paradoxically, the government asserts that we cannot review the Board Members' separate statements for reasonableness while simultaneously allowing them to be considered as evidence in its jurisdictional argument. *Compare* Resp'ts Br. 17 (only decisions "of the Board" may be reviewed for reasonableness) *with* Oral Arg. 1:45:00–1:50:00 (Feb. 4, 2021) (arguing that the *Cargill* issue would not have impacted the Board Members' separate statements). The dissent quite rightly points out this contradiction. But since both Parties invite us to entertain these statements for the purpose of assessing redressability, we accept their position only for the sake of argument.

evidence" that *Cargill* is a problem, "there is at least a reasonable probability it would have decided to continue working on a solution." Dissent at 14. And that, in the dissent's view, "is all that Western Coal requests from this Court." *Id.* But, if mere continued deliberation is really *all* Petitioner seeks, redressability of its injury is clearly lacking. Petitioner must, at least, link a permissible court order to its concrete injury, not simply to an extension of the (so far futile) deliberations. *See Narragansett*, 949 F.3d at 13–14 (injury not redressable where petitioner "does not explain how any correction of procedural course would help it or what it could obtain out of a remand.").

Contrary to the dissent's suggestion, we do not hold that Petitioner must show that it would achieve a different substantive outcome. Our holding is a modest one: Where an agency has dismissed an ANPRM because it is mired in a good-faith deadlock, judges lack the power to pick the winning policy position. Sending the dispute back for continued deliberations—where *nothing* in the record indicates the reasonable possibility that remand would break that impasse— does not remedy Petitioner's injury.[8]

The dissent assumes that an alleged failure to address a major issue is a procedural injury. But we very much doubt that is so. Undeniably, we have "struggled" with the distinction between substance and procedure. *See JEM Broadcasting Co., INC v. FCC*, 22 F.3d 320, 327 (D.C. Cir. 1994). Depriving a party of the opportunity to participate in notice and comment is, for instance, a procedural injury. *See Summers v. Earth Island Institute*, 554 U.S. 488, 496–97 (2009). But the failure

---

[8] We cannot imagine why the dissent argues that our opinion, holding that we lack jurisdiction, undermines *State Farm*, a case in which jurisdiction is undisputed.

to respond to significant comments—which is what Petitioner essentially claims—violates a substantive guarantee of the APA.  As Justice White famously described, agency action is arbitrary and capricious if it "entirely failed to consider an important aspect of the problem."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  He did so in a list of actions that are all substantive—not procedural—violations of the APA.   *Id.*; *see also Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin.*, 741 F.3d 1309, 1312 (D.C. Cir. 2014).[9]  Logically, Petitioner's claim that the Board failed to consider whether *Cargill* was an aberration is no different than whether an agency properly considered a statutory provision.  We don't

---

[9] The dissent errs by relying on *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015), for the proposition that a failure to respond to significant comments is procedural.  There, the Court used the word procedure to describe an agency's order of analysis, not whether any command of the APA is procedural or substantive.  At best, we have said, the failure to respond to significant points raised during the comment period may be "described as 'quasi-procedural' rather than 'procedural.'" *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1042 (D.C. Cir. 2012) (quoting Merrick B. Garland, *Deregulation and Judicial Review*, 98 Harv. L. Rev. 505, 530 (1985)).  That requirement is concerned "not with the external process by which litigants present their arguments to the agency, but with the internal thought process by which an agency decisionmaker reaches a rational decision.  Thus, these requirements can be said to flow not from the APA's procedural dictates, but from its substantive command that agency decisionmaking not be 'arbitrary' or 'capricious.'" *Id.*; *see also Am. Trading Transp. Co. v. United States*, 841 F.2d 421, 424 (D.C. Cir. 1988) (a court reviews both the "substantive" question of whether an action is arbitrary and capricious as well as the "procedures . . . employed in reaching its decision.").

think that redressability is "relaxed" as the dissent believes. *See Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 5 (D.C. Cir. 2005) (whether an injury is categorized as substantive or procedural may affect our evaluation of chains of causation and redressability). However, assuming that the dissent is correct in describing the situation as involving a procedural injury, as we previously noted, the prospect of a remedy has to be a reasonable possibility. "Unadorned speculation will not suffice to invoke the judicial power." *Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1159 (D.C. Cir. 2005) (citations omitted).

Petitioner wishes us to hint that issue one in the ANPRM—whether *Cargill* is an aberration—is the crucial factor (even if cost-benefit analysis were to suggest no change is warranted). And the dissent appears to agree that the *Cargill* decision is, in fact, a problem. Even if we had jurisdiction over this case (which we do not), we think it is inappropriate to suggest that Petitioner is correct on the underlying issue, since that question is not before us.

The petition is dismissed.[10]

*So ordered.*

---

[10] After the Board dismissed its ANPRM, the League sought reconsideration of that decision, which the Board denied. *Rail Fuel Surcharges (Safe Harbor) Reconsideration Decision*, Fed. Carr. Cas. (CCH) ¶ 37432, 2019 WL 7484096 (S.T.B. Dec. 26, 2019). Although Petitioner also sought review of the denial of its request for reconsideration, it now concedes that the reconsideration decision "is of no practical consequence in this case." Reply Br. 17. Accordingly, we similarly dismiss Petitioner's challenge to the reconsideration decision for lack of jurisdiction.

WILKINS, *Circuit Judge*, dissenting:  The first step in solving a problem is recognizing there is one.  In 2014, the Surface Transportation Board ("Board") issued an advance notice of proposed rulemaking ("ANPR") seeking comment from interested parties on whether the phenomenon it observed in the *Cargill* adjudication—where a rail carrier was found to have used a safe harbor provision to make over $180 million in revenue from the fuel surcharge—was an aberration, and, if so, whether and how to address this problem.  Five years and one mandamus petition later, the Board discontinued the ANPR without responding to the comments it received.  Contrary to the majority, I would hold that the Western Coal Traffic League ("Western Coal") has standing to challenge the Board's discontinuation of the ANPR.  I would also hold that the Board's discontinuation was arbitrary and capricious.

**I.**

The Surface Transportation Board is tasked with overseeing the freight rail industry and, in this capacity, reviews the rates rail carriers charge and the carriers' practices. 49 U.S.C. §§ 10701; 10702.  In 2007, the Board promulgated a rule that addressed rail carriers' assessment of fuel surcharges on shippers.  Before 2007, carriers calculated fuel charges based on a base rate, which was market-based and not grounded in actual fuel cost increases.  As a result, carriers were earning more from fuel surcharges than they were spending on fuel.  In response, the Board's rule prohibited carriers from assessing fuel surcharges as a percentage of that base rate.  Instead, the fuel surcharges had to be based on factors directly related to fuel consumption.  The rule, however, did not prohibit additional surcharges; it only prohibited rail carriers from identifying them as fuel surcharges if those surcharges exceeded the amount spent on increased fuel costs. The rule also did not set a uniform fuel index to measure "incremental fuel costs"—additional fuel costs caused by

increased fuel prices that exceed a certain amount set in the fuel surcharge formula. Instead, the rule adopted a "Highway Diesel Fuel Index" ("HDF Index"), which served as a safe harbor index that carriers could rely on instead of using their actual incremental fuel costs.

In 2010, Cargill, Inc. ("Cargill"), a shipper of agricultural products, filed a complaint against carrier BNSF Railway Company ("BNSF") with the Board. *Cargill, Inc. v. BNSF Railway Co.*, 2013 WL 4067719 (S.T.B. 2013). Cargill alleged that BNSF was using the HDF Index to reap profits well in excess of its actual incremental fuel costs. The Board rejected Cargill's allegations. *Id.* at *5. The Board concluded that BNSF's reliance on the HDF Index to calculate the fuel surcharge was reasonable as long as BNSF used the "HDF Index as a proxy to measure changes in [its] internal fuel costs." *Id.* at *11. The Board then calculated the changes in internal fuel costs using the HDF Index and concluded that BNSF did not over-recover fuel costs. *Id.* at *14.

But the Board recognized that BNSF's use of the safe harbor provision "raised concerns." *Id.* The Board acknowledged that "the safe harbor can allow a rail carrier to recover more than its incremental fuel costs as measured by the carrier's internal fuel costs." *Id.* In this instance, the Board calculated that BNSF's fuel surcharge revenues exceeded its incremental fuel costs by some $181 million over five years. Since the Board did "not know if this was a unique situation" or "a more widespread phenomenon" and was concerned that the safe harbor could "immunize . . . over-recovery from scrutiny," the Board decided to "issue an advance[] notice of proposed rulemaking to give shippers, rail carriers, and other interested parties the opportunity to comment on the safe harbor, including whether it should be modified or removed." *Id.*

True to its word, the Board issued an advance notice of proposed rulemaking in 2014. The Board requested "comments from the public on whether the safe harbor provision of Fuel Surcharges should be modified or removed." J.A. 19. "In particular," the Board requested comments on (1) "whether or not the phenomenon . . . observed in *Cargill* . . . was likely an aberration," (2) "whether there are problems associated with the Board's use of the HDF Index as a safe harbor in judging the reasonableness of fuel surcharge programs," (3) "whether any problems with the safe harbor could be addressed through a modification of [the provision]," and (4) "whether any problems with the safe harbor are outweighed by its benefits." *Id.*

The Board received a total of twenty-five comments from carriers, shippers (including Petitioner Western Coal Traffic League), and other interested parties. Most commenters who addressed whether the *Cargill* phenomenon was an aberration argued that it was not, and that carriers had pocketed hundreds of millions of dollars in profits from these fuel surcharges. One commenter suggested that it might be a common occurrence but warranted further study. The carriers unanimously supported preserving the status quo; the shippers were divided. Some shippers, including Petitioner, recommended that the Board eliminate the safe harbor. Other shippers suggested that the safe harbor be modified. One shipper suggested that the HDF Index was not the primary cause of fuel surcharge problems. The Board closed the record in October 2014.

Then the Board did nothing for five years. Two years after the record closed, Western Coal requested that the Board take action, but the Board denied its request. After five years of inaction, Western Coal petitioned this Court for a writ of mandamus. We referred the petition to a merits panel. Order, *In re Western Coal Traffic League*, No. 19–1080 (Aug. 23, 2019). Five days later, the Board issued its decision to

discontinue the ANPR, which rendered the mandamus petition moot.

In its decision, the Board catalogued the "varied" comments submitted in response to the ANPR. The Board acknowledged that "many [comments] did not directly address the Board's question about whether the . . . phenomenon seen in *Cargill* was an aberration." J.A. 9. The Board noted that "[s]ome commenters claimed the *Cargill* outcome was an aberration, while another said there was insufficient evidence to answer the question." *Id.* (footnote omitted). But the Board did not acknowledge the numerous commenters who argued that the *Cargill* phenomenon was not an aberration and the evidence they presented that suggested that shippers were reaping profits in the hundreds of millions of dollars.

The Board "recognize[d] and appreciate[d] that commenters devoted substantial time and effort to responding to the" ANPR. J.A. 10. But the Board stated that it was "unable to reach a majority decision on what additional Board action should be taken in response to the comments received." *Id.* Thus, "[b]ecause of the lack of a majority opinion and in the interest of administrative finality," the Board discontinued the ANPR. *Id.*[1]

---

[1] The three Board members issued commenting statements. Chairwoman Begeman stated that she believed the safe harbor should be eliminated, but, because "there hasn't been a majority to coalesce around any approach (mine or any other one)," she voted "to close the proceeding rather than wait for a full complement of Board members in hopes that a majority view would be reached to repeal the safe harbor provision." J.A. 11. Board member Fuchs commented that he was opposed to modifying or removing the safe harbor provision out of fear of exacerbating the tension that would result from different standards for the fuel surcharge and the overall

Western Coal then petitioned for reconsideration and subsequently for judicial review. Western Coal claims that the Board's decision was arbitrary and capricious because it failed to respond to the comments answering the Board's own question of whether the *Cargill* phenomenon was an aberration. On review, Western Coal asks this Court to "hold unlawful, vacate and set aside the Decision[] and grant such further relief as may be deemed just and proper." Pet. for Review, *Western Coal Traffic League v. Surface Transp. Board*, No. 20–1058, at 2 (Feb. 28, 2020).

## II.

To establish the "irreducible constitutional minimum" of standing, the plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "When determining whether a plaintiff has Article III standing," we must assume that the plaintiff "will prevail on the merits." *Comm. on Judiciary of U.S. House of Reps. v. McGahn*, 968 F.3d 755, 762 (D.C. Cir. 2020) (en

---

rate. J.A. 12. In addition, Fuchs commented that carriers and customers have relied on the HDF Index, so he proposed leaving it in place and instead focusing on reforming the overall rate review process. J.A. 12–13. Finally, Board member Oberman commented that he thought that the relief sought in *Cargill* and the proposed amendment here was "at base, rate relief" and not a regulation of carrier practices. J.A. 13. Rather than eliminate the safe harbor provision, Oberman preferred that the Board reverse its *Rail Fuel Surcharges* decision, "which created the fuel surcharges rules and their safe harbor provision." *Id.* All three members, however, agreed that the proper course of action was to discontinue the proceedings.

banc). The majority concludes that Western Coal has failed to establish that its injury is redressable. I respectfully disagree.

We have held that when "a party alleges deprivation of its procedural rights, courts relax the normal standards of redressability." *Sierra Club v. FERC*, 827 F.3d 59, 65 (D.C. Cir. 2016) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 496–97 (2009)). "[T]he relaxed redressability requirement is met when correcting the alleged procedural violation *could* still change the substantive outcome in the petitioner's favor; the petitioner need not go further and show that it would *effect* such a change." *Narragansett Indian Tribal Historic Pres. Office v. FERC*, 949 F.3d 8, 13 (D.C. Cir. 2020). Thus, a party has satisfied the redressability prong when prevailing on the merits would require the agency to "incorporate into its . . . analysis the omitted" data, and "[u]pon considering [this data], the [agency] could change its position." *Sierra Club*, 827 F.3d at 67; *see also Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 185 (D.C. Cir. 2017) (finding that the petitioner satisfied the redressability prong by showing that the agency "*could* reach a different conclusion" with the necessary data). The relaxed standard of redressability is clearly met here.

In issuing the ANPR, the Board specifically framed its central question of whether to modify or remove the safe harbor provision around "whether . . . the phenomenon . . . observed in *Cargill* . . . was likely an aberration." J.A. 19. Although the Board did not know "if this was a unique situation," *Cargill*, 2013 WL 4067719, at *14, it qualified that "a more widespread phenomenon . . . could undermine the usefulness of the safe harbor provision," J.A. 19. The Board further recognized that "the safe harbor provision provides rail carriers with an unintended advantage." *Id.* Consequently, the Board issued the ANPR, which specifically asked interested parties to address "whether or not the phenomenon . . . observed in *Cargill* . . . was likely an aberration." *Id.* In so doing, the Board

made clear that if the *Cargill* phenomenon was a common occurrence, it would pose a problem that the Board needed to address in one way or another.[2]

In answering whether the *Cargill* phenomenon was a common occurrence, the majority of commenters responded "yes." But you would never know that from reading the Board decision, which did not acknowledge those comments at all. Instead, the Board gave the misimpression that the commenters either did not address *Cargill*, believed that *Cargill* was an aberration, or were not sure whether *Cargill* was an aberration. J.A. 9–10. This was absolutely false. The Board received multiple comments stating that the *Cargill* phenomenon was not an aberration.[3] And these comments were not solely from shippers. Indeed, the United States Department of Agriculture, a government agency with expertise in rail transportation matters, submitted a comment stating that the *Cargill* phenomenon was likely not an aberration. J.A. 31. In ignoring these comments, the Board made it easier for itself to dodge the problem—because the Board could discontinue the proceeding without ever acknowledging the considerable evidence that there was a problem.

---

[2] The majority suggests that because the *Cargill* question was only one of four presented in the ANPR, it was not a material error for the Board to fail to address the comments responding to that question. Maj. Op. at 13. But the context shows that the *Cargill* question was the entire reason for the rulemaking, and understanding the *Cargill* issue was key to determining how best to proceed.

[3] I highlight the number of comments not because their numerosity indicates that the comments were correct, as suggested by the majority, Maj. Op. at 6 n.4, but because their numerosity demonstrates how much the Board contorted itself to avoid acknowledging those comments. The Board's silence in response to what most of the commenters were saying is indeed deafening.

It is axiomatic that the first step of addressing a problem is to acknowledge that it exists. That is why the basic rule from *State Farm* is that agencies cannot ignore relevant data. As the Supreme Court made clear, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). To hold that the injury is not redressable here is to undermine the basic premise of *State Farm*. The Board made a choice to give up; it could instead have made a choice to hire consultants, to hold hearings, to strive for a compromise, or to take any number of other steps commonly used when trying to forge a solution.[4] Yet the Board never articulated any explanation, let alone a "satisfactory" one, for choosing to give up in the face of evidence that the *Cargill* phenomenon it had identified was endemic and costing shippers hundreds of millions of dollars. There was never any "rational connection between the facts found and the choice

---

[4] These examples merely highlight that the Board could have done what agencies do all the time to attempt to make progress on their deliberations and potentially reach a solution. Perhaps the Board would try one or more of these tactics, or perhaps it would try something else—its specific path forward is irrelevant, as is *Vermont Yankee*. Maj. Op. at 9. The point is that if the Board were forced to consider all of the evidence before it, there is at least a possibility that it would conclude the *Cargill* phenomenon is widespread and merits further work towards a policy solution. It is often the case that fully reckoning with the vast scope of an issue motivates compromise and a solution. As the saying goes, "necessity is the mother of invention." This is not an intrusion on the Board's prerogatives; it is simply requiring the Board to base its action (or inaction) on a consideration of all the material evidence, rather than on a cherry-picked set of facts.

made," *id.*, because the Board refused to acknowledge the facts.

It is much easier to give up on a mission if you believe that you can later say, with a straight face, that the mission was not really that important after all. That is what the Board did here—it said no one presented evidence that the *Cargill* phenomenon was a common occurrence, which made it easier for the Board to walk away from further efforts to forge a solution to the problem identified in the *Cargill* case. All that is required to show redressability in these circumstances is that if the Board were forced to address the evidence that the problem identified in *Cargill* was a recurring one, to the tune of hundreds of millions of dollars, the Board *could* decide to keep working on the problem, rather than throwing in the towel. *See Sierra Club*, 827 F.3d at 67.

That is not a heavy lift. Even though we have recognized that members of an agency "may cast their votes solely to void an impasse, or otherwise to draw the administrative phase to a close," *Pub. Serv. Comm'n v. Fed. Power Comm'n*, 543 F.2d 757, 777 (D.C. Cir. 1974), we also explained that "[w]e d[id] not mean to suggest that a commissioner's vote, once made, imprisons him in an intellectual strait-jacket." *Id*. After all, there is no "requirement, statutory or otherwise, that members of administrative agencies maintain consistent positions throughout the course of lengthy proceedings." *Id*. But that is precisely what the majority assumes when it concludes that the Board members could not have changed their minds after properly considering the record before them. We set a dangerous precedent if we hold that an agency that not just ignores, but misstates the comments and evidence before it, *could not* change its mind if forced to truly address the record on remand. "[I]t bears repeating that the duty to respond to significant comments finds a statutory basis in required notice and comment procedures, for 'the opportunity to comment is

meaningless unless the agency responds to significant points raised by the public.'" *Alabama Power Co. v. Costle*, 636 F.2d 323, 384 (D.C. Cir. 1979) (quoting *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35–36 (D.C. Cir. 1977)); *Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89, 95 (D.C. Cir. 2002) (Silberman, J.) ("If a party claiming the deprivation of a right to notice-and-comment rulemaking under the APA had to show that its comment would have altered the agency's rule, section 553 would be a dead letter.").

The majority does not seem to dispute that the Board ignored the numerous comments indicating that the *Cargill* phenomenon was not an aberration. Yet, without acknowledging our precedent that Board members are not confined to an "intellectual straitjacket" and can change their minds during the course of a lengthy proceeding, *Pub. Serv. Comm'n*, 543 F.2d at 777, and notwithstanding the bedrock principle that agency decision-making should be based on a consideration of all of the relevant facts, *State Farm*, 463 U.S. at 43, the majority holds that the Board could not change its decision even if it actually considered all of the facts. "Don't confuse us with the facts" is now apparently acceptable agency practice.

The majority errs further by holding that remand is futile because the Board could not possibly break its deadlock, even if it is told to consider the record evidence that it ignored. Maj. Op. at 15. As best as I can tell, this is the first time we have ever presumed, in a case where the agency ignored clearly material comments, that there is no chance that the agency's final decision would be different if the agency had considered the ignored comments.[5] To find no redressability on this

_____

[5] The majority relies on our decision in *Narragansett*, 949 F.3d at 13–14, to emphasize that Western Coal must "link a permissible

ground cuts against the grain of all our procedural injury precedent. We have unequivocally stated that "[a] plaintiff asserting procedural injury 'never has to prove that if he had received the procedure the substantive result would have been altered.'" *City of Dania Beach v. FAA*, 485 F.3d 1181, 1186 (D.C. Cir. 2007) (quoting *Sugar Cane Growers*, 289 F.3d at 94); *Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 595 (D.C. Cir. 2019) (per curiam) ("The Sierra Club need not show that the EPA 'would alter' the 2018 rule if ordered to comply with its ESA obligations, but rather that 'the EPA *could* reach a different conclusion.' The Sierra Club has made this showing. There 'remains at least the possibility' that the EPA could set different standards, by, for example, invoking the general waiver for severe environmental harm." (quoting *Ctr. for Biological Diversity*, 861 F.3d at 185) (citations omitted)).

For the same reason, the majority's repeated declaration that this Court has no power to break the Board's deadlock is a red herring. Maj. Op. at 8, 9, 10, 15. Petitioner has not asked us to break the deadlock, but to find that the Board acted unlawfully by failing to consider all of the significant comments and to remand. Pet'r Br. at 2, 23–27, 29. In *Sugar Cane Growers*, we reversed the district court's holding that the

court order to its concrete injury." Maj. Op. at 15. But *Narragansett* is inapposite. There, the harm to the Narragansett Tribe's cultural heritage had already occurred and could not be remedied by righting the procedural injury. *Narragansett*, 949 F.3d at 13–14 ("[F]ixing the alleged defect in the Commission's regulatory procedures could not possibly prevent or mitigate the harm to the Narragansett Tribe's cultural and religious interests" because "there was 'no possibility' that the already completed action could be undone") (quoting *Humane Soc'y of the United States v. Babbitt*, 46 F.3d 93, 100–01 (D.C. Cir. 1995)). Here, on the other hand, a remand to the Board for further deliberation and consideration of the comments addressing the *Cargill* phenomenon could undo the harm alleged by Western Coal.

plaintiffs could not show redressability because they could not prove that the agency would have adopted a different rule had it considered the significant comments that were ignored, because requiring the plaintiffs to show that consideration of all of the comments would lead to a different outcome "simply misstates the law." 289 F.3d at 94. By requiring Petitioner to prove that we can (and should) break the deadlock, the majority addresses a remedy that was never even sought, and it erroneously raises the redressability bar contrary to *Sugar Cane Growers* and numerous other cases. *See Lujan*, 504 U.S. at 572 n.7 ("There is this much truth to the assertion that 'procedural rights' are special . . . . [U]nder our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, *even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered . . . .*" (emphasis added)); *West v. Lynch*, 845 F.3d 1228, 1237 (D.C. Cir. 2017) (holding that when an agency prepares an environmental impact statement, "the plaintiff need not allege that, if he were to succeed in enforcing a NEPA-required procedure the defendant agency did not follow, the agency's substantive policy would change"); *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 669 (D.C. Cir. 1996) (en banc) ("[I]n EIS suits, a court should not review redressability—whether the preparation of the EIS might alter the decision to license the dam (or, here, grant the tax credit)."); *Western Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1249 (D.C. Cir. 2018) (Edwards, J., concurring) ("[T]he right to challenge an agency's failure to act in preparing an EIS is not diminished by the fact that such a suit protects merely a plaintiff's 'procedural right' to have the EIS issued, rather than any 'substantive right' regarding the action the agency will ultimately take."). None of these cases remanded to the agency because the court was trying to "pick the winning policy position," *see* Maj. Op. at

15, rather, the purpose of the remand was always simply to compel the agency to follow the mandated procedures. So it is here.

The majority "doubts" that the failure to respond to significant comments is a procedural injury. Maj. Op. at 15. But the Supreme Court has held otherwise. *See Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015). In *Perez*, the Supreme Court explained that an agency's obligation to "consider and respond to significant comments received during the period for public comment" was part of the three-step procedure for notice-and-comment rulemaking pursuant to Section 553 of the APA. *Id.* Contrary to the protestations of the majority, Maj. Op. at 16 n.9, the Court explicitly stated that "the purpose" of Section 553 is to "say what procedures an agency must use when it engages in rulemaking." *Perez*, 575 U.S. at 101; *see also id.* at 109 (Scalia, J., concurring) ("The Act [Section 553] guards against excesses in rulemaking by requiring notice and comment. Before an agency makes a rule, it normally must notify the public of the proposal, invite them to comment on its shortcomings, *consider and respond to their arguments*, and explain its final decision in a statement of the rule's basis and purpose." (emphasis added)). Prior to *Perez*, we had also described an agency's failure to respond to significant comments as a procedural injury. *Int'l Fabricare Inst. v. EPA*, 972 F.2d 384, 389 (D.C. Cir. 1992) (citing *PPG Indust., Inc. v. Costle*, 630 F.2d 462, 466 (6th Cir. 1980)); *Home Box Office*, 567 F.2d at 35–36. It is true, as the majority points out, that *State Farm* described the failure to respond to comments as a classic form of arbitrary and capricious decision-making, 463 U.S. at 43, as have we, *see Lilliputian Systems, Inc. v. Pipeline & Hazardous Materials Safety Admin.*, 741 F.3d 1309, 1312 (D.C. Cir. 2014); *Allied Local & Regional Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000); *Public Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993). But that observation hardly strengthens the

majority's position; rather, it shows that when an agency ignores significant comments, it flouts both substance and procedure. Yet the majority concludes that there is no possibility that the agency would conduct itself differently if forced to correct this double-error. Of course, standing was not at issue in *Perez* or *State Farm*, but in each case, the Court described the injury that occurs when an agency ignores significant comments as a violation of cardinal principles of administrative law. By applying a heightened, rather than relaxed, standard of redressability in this case, the majority responds to the injury described by *Perez*, *State Farm*, and a plethora of other cases as so fundamental with little more than a shrug, severely undermining the impact of these important precedents.

When it issued the ANPR, the Board acknowledged that the entire motivation for commencing the proceeding was that "th[e] result [in *Cargill*] concerned the Board." J.A. 18. Had the Board acknowledged the evidence suggesting that the magnitude and scope of the *Cargill* phenomenon was indeed vast, there is at least a reasonable probability it would have decided to continue working on a solution.[6] That is all that Western Coal requests from this Court. *See* Pet. for Review, *Western Coal Traffic League*, No. 20–1058, at 2. And that is all that is required to satisfy the "relaxed" standard of redressability under our precedent. To hold otherwise fails to apply the "relaxed" standard of redressability and grants license for agencies to ignore evidence and pretend that

---

[6] The majority concludes, and I agree, that we should look only to the Board's decision. Maj. Op. at 11. But the majority proceeds to rely on the statements by Board Members Oberman and Fuchs to confirm that they would not change their stance. Maj. Op. at 14. And since the individual statements are "quite out of bounds," we should not consider them for the purposes of determining redressability.

problems within their purview do not exist. It's always easier to take the route of the ostrich, but members of federal agencies swear an oath to solve the problems assigned to them by the Congress.

The claims of Western Coal satisfy Article III standing. I would therefore proceed to the merits.

**III.**

Although it faces a heavier burden on the merits than on standing, I would also find for Western Coal on the merits and vacate and remand to the Board. We review the Board's decisions under the standards set forth in the APA. *Snohomish Cnty. v. STB*, 954 F.3d 290, 301 (D.C. Cir. 2020). Consequently, we will set aside an agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "An agency decision is arbitrary and capricious if it is not reasonably explained." *Antilles Consol. Educ. Ass'n v. FLRA*, 977 F.3d 10, 15 (D.C. Cir. 2020). And while "[t]he arbitrary and capricious standard is deferential," only requiring that the "agency action simply be 'reasonable and reasonably explained,'" *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 409 (D.C. Cir. 2020) (quoting *Cmtys. for a Better Env't v. EPA*, 748 F.3d 333, 335 (D.C. Cir. 2014)), the agency must have "examined the relevant considerations and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Int'l Longshore & Warehouse Union v. NLRB*, 971 F.3d 356, 360 (D.C. Cir. 2020) (quoting *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016)).

When reviewing an agency's discontinuation of proceedings under an ANPR, we are more deferential to the agency than we are when it discontinues a notice of proposed rulemaking. But the agency receives less deference than it

would were it denying a petition for rulemaking. *Consumer Fed'n of Am. v. Consumer Prod. Safety Comm'n*, 990 F.2d 1298, 1304–05 (D.C. Cir. 1993). Yet even when reviewing an agency's denial of a petition for rulemaking, which we will "overturn[] only in the rarest and most compelling of circumstances," we have held that an agency's failure to provide any "articulation of the factual and policy bases for [the] decision" is sufficient to warrant a remand. *Am. Horse Prot. Ass'n, Inc. v. Lyng*, 812 F.2d 1, 5–6 (D.C. Cir. 1987) (internal quotations and citations omitted) (second alteration in original).

In discontinuing the ANPR, the Board failed to respond to the significant comments that directly provided the information that the Board *itself* requested. The Board specifically solicited comments that addressed "whether or not the phenomenon . . . observed in *Cargill* . . . was likely an aberration," J.A. 19, after it acknowledged that "a more widespread phenomenon" could "undermine the usefulness of the current safe harbor provision" by "immuniz[ing] . . . over-recovery from scrutiny," *Cargill*, 2013 WL 4067719, at *14. The Board's framing in *Cargill* and the ensuing ANPR thus placed it in the class of cases in which an agency questions whether the factual premise underlying its regulatory scheme is wrong in such a way that requires amendment. *See Am. Horse Prot. Ass'n*, 812 F.2d at 5 ("[A] refusal to initiate a rulemaking naturally sets off a special alert when a petition has sought modification of a rule on the basis of a radical change in its factual premises."). Once the Board reached this point, it was compelled to—at a minimum— respond to comments stating that the *Cargill* phenomenon was not an aberration, or, put differently, whether the factual premise underlying its regulatory scheme had changed.

But the Board failed to meet this minimal requirement. Instead, the Board noted that some commenters (including BNSF, the respondent in *Cargill*) believed that the *Cargill*

phenomenon was an aberration and acknowledged that one commenter stated that there was insufficient evidence to answer the question.[7] J.A. 10. The Board failed to even tip its hat to the commenters who claimed that the *Cargill* phenomenon was not an aberration. These commenters stated that the safe harbor provision "can involve millions of dollars, even for a single shipper," J.A. 32, that two carriers reaped almost $850 million in profits using the safe harbor provision during a three-year stretch, J.A. 81, and that the safe harbor provision "reduce[s] transparency and diminish[es] shipper confidence," J.A. 171. And rather than acknowledge that it disagreed with these comments or that it had insufficient information to determine whether the *Cargill* phenomenon was an aberration, the Board stuck its head in the sand and ignored those comments entirely. This behavior falls short of the minimal process the decision to rescind an ANPR requires.

As stated earlier, it is a hallmark of administrative law that an agency must "examine the relevant data." *State Farm*, 463 U.S. at 43. To adhere to this principle, the agency must "respond to significant points raised by the comments, especially when those comments challenge a fundamental premise underlying" the agency action. *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 345 (D.C. Cir. 2019).

---

[7] And this characterization of the comment finding insufficient evidence is dubious. In its comment, Dow Chemical stated that "the phenomenon noted by the Board in *Cargill* may not be an aberration." J.A. 236. Dow Chemical commented that "[p]ublicly available data raises serious questions about whether the significant revenue generated by these fuel surcharge programs is limited solely to recovery of the incremental fuel cost incurred by the railroads." *Id.* While Dow Chemical acknowledged that there was "a paucity of publicly available data . . . evidence suggests the Board's *Cargill* concern is not misplaced," and Dow urged the Board to "continue its investigation into the fuel surcharge programs used by the nation's railroads." J.A. 236–37.

Fundamentally, "the opportunity to comment is meaningless unless the agency responds to significant points raised by the public." *Home Box Office*, 567 F.2d at 35–36 (footnote omitted). Indeed, we have repeatedly made clear that an agency's failure to consider relevant evidence is arbitrary and capricious. *See, e.g.*, *Butte Cnty v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("[A]n agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of § 706."); *Morall v. DEA*, 412 F.3d 165, 178 (D.C. Cir. 2005) ("[The agency's] decision does not withstand review because the agency decisionmaker entirely ignored relevant evidence."); *ALLTEL Corp. v. FCC*, 838 F.2d 551, 558 (D.C. Cir. 1988) ("[T]he Commission must do more than simply ignore comments that challenge its assumptions and must come forward with some explanation that its view is based on some reasonable analysis."). As shown above, not only did the Board fail to respond to the comments suggesting that *Cargill* was not an aberration, it ignored them entirely, all to make it easier to justify its decision to discontinue efforts to reach an agreement. But the Board's claim of administrative impasse does not relieve it of its responsibility to respond to significant comments, and this abdication of responsibility cannot survive arbitrary-and-capricious review.

## IV.

Because I believe that Western Coal has satisfied its Article III standing obligations by showing that the Board could have changed course had it considered the comments submitted, I respectfully dissent. Good government surely requires more than this.